IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
<u>NEW ORLEANS DIVISION</u>

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA and the LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and PERFORMANCE MATERIALS NA, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

<u>COMPLAINT</u>

Plaintiffs, the United States of America (United States), by the authority of the Attorney General, and through the undersigned attorneys, acting on behalf of the Administrator of the United States Environmental Protection Agency (EPA), and the Louisiana Department of Environmental Quality (LDEQ), file this Complaint and allege as follows:

I. <u>NATURE OF THE ACTION</u>

1.      This civil action seeks injunctive relief and civil penalties from The Dow Chemical Company (Dow), and its wholly owned subsidiaries Union Carbide Corporation (Union Carbide) and Performance Materials NA, Inc. (PMNA) (*collectively*, Defendants) for violations of the Clean Air Act, 42 U.S.C. § 7401 *et seq*. (CAA), the Louisiana Environmental Quality Act, La. R.S. 30:2001 et seq. (LEQA), the regulations promulgated pursuant to those statutes, and the operating permits that incorporate those requirements.

2.      The United States brings this case pursuant to Clean Air Act Sections 113(b) and 167, 42 U.S.C. §§ 7413(b) and 7477, based on the Defendants' alleged failures to adhere to good

air pollution control practices, including its failures to properly operate, maintain, monitor, and control steam-assisted flares at four of Defendants' petrochemical manufacturing facilities. Defendant Dow owns and operates the facilities located in Freeport, Texas (Freeport Facility) and Plaquemine, Louisiana (Plaquemine Facility). Defendant Union Carbide owns and operates the facility located in Hahnville, Louisiana (Hahnville Facility). Defendant PMNA owns and operates the facility located in Orange, Texas (Orange Facility) (*collectively*, Defendants' Facilities). LDEQ brings this case pursuant to the LEQA based on these same failures with respect to Defendants' Plaquemine and Hahnville Facilities.

3.       Defendants' alleged violations of the CAA and the LEQA resulted in thousands of tons of illegal emissions of volatile organic compounds (VOCs), hazardous air pollutants (HAPs), and other pollutants into the air in the states of Louisiana and Texas.

## II. JURISDICTION AND VENUE

4.       This Court has jurisdiction over the subject matter and the parties hereto, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has personal jurisdiction over the Defendants because they do business in the state of Louisiana and within the jurisdictional boundaries for the federal district court for the Eastern District of Louisiana, as established by Congress under 28 U.S.C. § 98(a).

5.       This Court has supplemental jurisdiction over the state law claims asserted by the LDEQ pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims alleged in the United States' action that they form part of the same case or controversy.

6.       Venue is proper in this Judicial District, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged in this Complaint occurred and are occurring at the Defendants' Facilities located in this District.

## III. NOTICE

7.      Notices of violations were given to Defendants, and the states of Louisiana and Texas as required by CAA Section 113(a)(1), 42 U.S.C. § 7413(a)(1). Notice of commencement of this action was given to the states of Louisiana and Texas as required by CAA Section 113(b), 42 U.S.C. § 7413(b).

8.      The thirty-day period established in CAA Section 113(a), 42 U.S.C. § 7413(a), between the notices of violation provided by the United States and the commencement of this civil action has passed.

## IV. AUTHORITY

9.      The United States Department of Justice has the authority to bring this action on behalf of EPA under, *inter alia*, 28 U.S.C. §§ 516 & 519, and under Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

## V. DEFENDANTS

10.      Defendant Dow Chemical Company is a Delaware corporation that does business in the states of Louisiana and Texas.

11.      At all times relevant to the Complaint, Defendant Dow has owned and operated the following facilities: a) Plaquemine Petrochemical Plant, Plaquemine, Louisiana (Plaquemine Facility), and b) Freeport Petrochemical Plant, Freeport, Texas (Freeport Facility).

12.      Defendant Union Carbide Corporation is a New York corporation authorized to do business in the state of Louisiana. Union Carbide is organized and operates as a wholly owned subsidiary of Defendant Dow.

13.      At all times relevant to the Complaint, Defendant Dow, or a predecessor-in-interest, both directly or through Defendant Union Carbide has owned and operated a

3

petrochemical manufacturing plant located in Hahnville, Louisiana (Hahnville Facility).

14.     Defendant Performance Materials NA, Inc., is a Delaware corporation authorized to do business in the state of Texas. PMNA operates and is organized as a wholly owned subsidiary of Defendant Dow.

15.     At all times relevant to the Complaint, Defendant Dow, or a predecessor-in-interest, both directly, or through Defendant PMNA has owned and operated the Sabine River Works plant located in Orange, Texas (Orange Facility).

16.     The Plaquemine, Freeport, Hahnville, and Orange Facilities are collectively referred to as the "Defendants' Facilities."

17.     At all times relevant to the Complaint, each of the Defendants has been a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e) and the applicable federal and state regulations alleged herein.

## VI. CLEAN AIR ACT STATUTORY AND REGULATORY BACKGROUND

A. National Ambient Air Quality Standards (NAAQS) and New Source Review (NSR)

### 1. General

18.     CAA Section 108(a), 42 U.S.C. § 7408(a), requires EPA to identify and prepare a list of each air pollutant that results from numerous or diverse mobile or stationary sources and that may endanger public health or welfare through its emissions. EPA must then issue air quality criteria for each such "criteria" air pollutant.

19.     CAA Section 109, 42 U.S.C. § 7409, requires EPA to promulgate regulations establishing primary and secondary NAAQS for air pollutants for which air quality criteria have been issued pursuant to Section 108 of the CAA. Under Section 109(b) of the CAA, 42 U.S.C. § 7409(b), the primary NAAQS must be adequate to protect the public health with an adequate margin of safety. The secondary NAAQS must be adequate to protect the public welfare from

4

known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

20.     Pursuant to CAA Sections 108 and 109, 42 U.S.C. §§ 7408 and 7409, EPA has identified and listed air quality criteria and NAAQS for the following criteria air pollutants: ground level ozone, particulate matter (PM), nitrogen dioxide, carbon monoxide (CO), lead, sulfur dioxide ($SO_2$) (*collectively*, the Criteria Pollutants). *See* 40 C.F.R. §§ 50.8-50.11 (primary NAAQS); *see also* 40 C.F.R. §§ 50.15 and 50.19 (secondary NAAQS).

21.     VOCs readily react in sunlight with NOx – forming the criteria pollutant ozone.

22.     Pursuant to CAA Section 107(d), 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries (known as "air quality control regions") where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. An area that meets the NAAQS for a particular pollutant is deemed an "attainment" area, while an area that does not meet the NAAQS for a particular pollutant is deemed a "non-attainment" area. The states' air quality designations are identified at 40 C.F.R. Part 81.

23.     At all times relevant to this Complaint, St. Charles Parrish, Louisiana, where the Hahnville Facility is located has been classified as "in attainment" for all Criteria Pollutants.

24.     At all times relevant to this Complaint, Iberville Parrish, Louisiana, where the Plaquemine Facility is located has been classified as "in attainment" for all Criteria Pollutants.

25.     At all times relevant to this Complaint, Orange County, Texas, where the Orange Facility is located has been classified as "in attainment" for all Criteria Pollutants.

26.     At all times relevant to this Complaint, Brazoria County, Texas, where the Freeport Facility is located has been classified as "non-attainment" for ozone.

2. State Implementation Plans

27.     CAA Section 110, 42 U.S.C. § 7410, requires each state to adopt and submit to the EPA for approval a plan that provides for the attainment and maintenance of the NAAQS in each air quality control region within each state. This plan is known as a state implementation plan (SIP).  SIPs are enforceable by the respective states in which they are adopted, and pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), by the United States.

28.     Of relevance to this Complaint, Section 110(a)(2)(C) of the CAA, 42 U.S.C. § 7410(a)(2)(C), requires each SIP to include, *inter alia*, "regulation of the modification and construction of any stationary source . . . as necessary to assure that [NAAQS] are achieved, including a[n NSR] permit program," which includes the prevention of significant deterioration (PSD) program required by part C of Subchapter I of the CAA.

3. Prevention of Significant Deterioration (PSD) Requirements

29.     Part C of Subchapter I of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as attainment areas for purposes of complying with the NAAQS. *See* 42 U.S.C. § 7470 (Purpose of PSD requirements). EPA's regulations that implement the PSD program are found at 40 C.F.R. § 52.21 (the PSD Regulations). Together, these provisions are referred to as the "PSD program."

30.     The core of the PSD program is the prohibition that "[n]o major emitting facility…may be constructed in any [attainment] area" unless various requirements are met. *See* 42 U.S.C. § 7475(a). These requirements include, *inter alia*, obtaining a "PSD permit" with emissions limitations based on the "best available control technology" (BACT) to control air emissions. *Id.*; *see also* 40 C.F.R. § 52.21(j)-(r). The PSD regulations also require a

demonstration that emissions from a newly constructed or modified facility will not contribute to a violation of a NAAQS. *See* 42 U.S.C. § 7475(a); 40 C.F.R. § 52.21(k).

31.     CAA Section 169(1), 42 U.S.C. § 7479(1), defines "major emitting facility" to include any chemical process plant that emits or has the potential to emit 100 tons per year (TPY) or more of any air pollutant. Major emitting facilities also include any other source with the potential to emit 250 TPY or more of any air pollutant.

32.     The PSD regulations define *construction* as "any physical change in or change in the method of operation (including fabrication, erection, installation, demolition, or modification) which would result in a change in actual emissions." 40 C.F.R. § 52.21(b)(8). *Construction* is also defined to include the *modification* (as defined in CAA Section 111(a), 42 U.S.C. § 7411(a)) of any source or facility. 42 U.S.C. § 7479(2)(C).

33.     *Modification* is defined as "any change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a).

34.     The PSD regulations define *major modification* as "any physical change in or change in the method of operation of a major stationary source that would result in a significant new emission increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i).

35.     The PSD regulations set individual thresholds for each criteria pollutant that define whether a net emissions increase of a pollutant is *significant*. *See* 40 C.F.R. § 52.21(b)(23)(i). For ozone, *significant* means a net emissions increase of, or the potential of a source to emit 40 TPY or more of VOCs or NOx. *Id*. For NOx, the significance threshold is 40 TPY. *Id*. For CO, the significance threshold is 100 TPY. *Id*.

36.     The PSD regulations define *net emissions increase* as "the amount by which the sum of the following exceeds zero: a) any increase in actual emissions from a particular physical change or change in method of operation at a stationary source and b) any other increases or decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable." 40 C.F.R. § 52.21(b)(3).

37.     In an attainment area, a newly constructed stationary source or a major modification to an existing stationary source must install and operate BACT, as defined in 40 C.F.R. § 52.21(b)(12), for each pollutant subject to regulation under the CAA that it would have the potential to emit in significant amounts or for which the modification would result in a significant net emissions increase. 40 C.F.R. § 52.21(j)(2)-(j)(3).

### 4. Non-attainment NSR Requirements

38.     Part D of Subchapter I of the CAA, 42 U.S.C. §§ 7501-7515, sets forth requirements that are intended, *inter alia*, to reduce emissions of air pollutants in areas that have not attained the NAAQS.

39.     CAA Sections 110(a)(2)(C) and (I) and 172(c), 42 U.S.C. §§ 7410(a)(2)(C) and (I) and 7502(c), require that each SIP contain requirements to review and permit newly constructed or modified sources of criteria air pollutants in non-attainment areas (Non-attainment NSR). Permits for these actions must be issued in accordance with CAA Section 173, 42 U.S.C. § 7503, and contain requirements that will facilitate "reasonable further progress" towards attainment of NAAQS. 42 U.S.C. §§ 7502(c)(2) and (c)(5).

40.     CAA Section 173, 42 U.S.C. § 7503, requires that, in order to obtain a permit for the construction or major modification of a major stationary source in a non-attainment area, the owner and operator of the source must, *inter alia*: a) comply with the lowest achievable emission

rate (LAER), as defined in CAA Section 171(3), 42 U.S.C. § 7501(3); b) obtain federally

enforceable emission offsets at least as great as the new or modified source's emissions; c)

conduct an air quality impact analysis; and d) analyze alternative sites, sizes, production

processes, and environmental control techniques for the proposed source, and then demonstrate

that the benefits of the proposed source significantly outweigh the environmental and social costs

imposed due to its location, construction, or modification. 42 U.S.C. §§ 7503(a)-(c); 40 C.F.R.

Part 51, Appendix S, Part IV, Conditions 1-4.

41.     *Major stationary source* generally means any stationary source with the potential

to emit 100 TPY or more of any regulated NSR pollutant. 40 C.F.R. § 51.165(a)(1)(iv)(A).

However, in areas that are in non-attainment for ozone, lower thresholds may qualify a stationary

source of VOCs as a major stationary source. *Id*.

42.     *Significant* has the same meaning as under the PSD regulations, except that under

the Non-attainment NSR program, lower TPY thresholds may qualify as being significant.

40 C.F.R. § 51.165(a)(1)(x)(B).

### 5. PSD and Non-attainment NSR in Louisiana and Texas

43.     In addition to the requirements found in Section 110(a)(2)(c) of the CAA, 42

U.S.C. § 7410(a)(2)(c), Section 161 of the CAA, 42 U.S.C. § 7471, also requires that each SIP

contain a PSD program. A state may comply with Section 161 by having EPA delegate authority

to enforce federal PSD regulations set forth at 40 C.F.R. § 52.21, or by having its own PSD

regulations approved by EPA as part of its SIP. In order for EPA to approve a state PSD

program, the state requirements must be at least as stringent as the requirements set forth at 40

C.F.R. § 51.166.

44.     CAA Sections 110(a)(2)(C) and (I) and 172(c), 42 U.S.C. §§ 7410(a)(2)(C) and

(I) and 7502(c), require that each SIP contain requirements to attain the primary NAAQS in non-attainment areas.

45.     A state may comply with CAA Sections 172 and 173 if EPA delegates authority to enforce the federal Non-attainment NSR regulations to the state. A state may also comply by promulgating its own Non-attainment NSR regulations that then must be approved by EPA as part of the SIP. In order to be approved, a state's Non-attainment NSR regulations must be at least as stringent as those in 40 C.F.R. § 51.165.

46.     The EPA has approved Louisiana's PSD and Non-attainment NSR permit programs. *See* LAC 33:III.501 and 509 (PSD program) (approved Mar. 8, 1989, 54 Fed. Reg. 9795) and La. Admin. Code (LAC), Title 33, Part III, § 504 (Non-attainment NSR program) (approved Sept. 30, 2002, 67 Fed. Reg. 61,260). *See also* 40 C.F.R. §§ 52.970 and 52.999(c) (EPA approvals of subsequent revisions to Louisiana PSD and Non-attainment NSR program requirements).

47.     The EPA has approved Texas' PSD and Non-attainment NSR permit programs. *See* 30 Texas Administrative Code (hereafter, TAC) §§ 116.160-116.163 (PSD program) (approved Sept. 27, 1995, 60 Fed. Reg. 49,781) and 30 TAC §§ 116.150-116.151 (Non-attainment NSR program) (approved Sept. 27, 1995, 60 Fed. Reg. 49,781). *See also* 40 C.F.R. §§ 52.2273 and 52.2303 (EPA approvals of subsequent revisions to Texas PSD and Non-attainment NSR program requirements).

48.     At all times relevant to this Complaint, Louisiana and Texas have been authorized to issue and enforce PSD and Non-attainment NSR permits. In all respects relevant to this Complaint, the Louisiana and Texas PSD and Non-attainment NSR regulations applicable to this action closely, if not exactly, mirror the federal PSD regulations and Non-attainment NSR

10

requirements at 40 C.F.R. §§ 51.165 and 51.166, and 40 C.F.R. Part 51, Subpart S, Part IV.

49.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. § 52.23, EPA may enforce violations of Louisiana's and Texas' federally approved PSD program and Non-attainment NSR program, as well as violations of permits issued pursuant to those programs.

### B. New Source Performance Standards

#### 1. General

50.     CAA Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources that, in EPA's judgment, cause of contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare. These categories correspond to distinct manufacturing processes or equipment within a given industry.

51.     Once a category is included on the list, CAA Section 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, also known as the New Source Performance Standards (NSPS) for these listed categories.

52.     *Standard of Performance* is defined as a "standard for emissions of air pollutants which reflect the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction, any non-air quality health and environmental impact, and energy requirements) the Administrator determines has been adequately demonstrated." 42 U.S.C. § 7411(a)(1).

53.     *New Source* is defined in the CAA as "any stationary source, the construction or modification of which is commenced after the publication of the NSPS regulations or proposed

NSPS regulations applicable to such sources." 42 U.S.C. § 7411(a)(2).

54.     *Stationary Source* is defined in the CAA as "a building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3).

55.     The NSPS are located at 40 C.F.R. Part 60.

56.     Clean Air Act Section 111(e), 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

### 2. NSPS Part 60, Subpart A: General Standards

57.     Pursuant to CAA Section 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B), EPA promulgated regulations that contain general provisions applicable to all NSPS source categories. *See* 40 C.F.R. Part 60, Subpart A, §§ 60.1- 60.19 (NSPS Subpart A).

58.     Under NSPS Subpart A, the provisions of Part 60 "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility." 40 C.F.R. § 60.1.

59.     *Affected facility* is defined in the CAA as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

### 3. NSPS Part 60, Subpart A: Good Air Pollution Control Practices

60.     Within NSPS Subpart A, EPA promulgated a regulation that applies at all times to all affected facilities, including associated air pollution control equipment. Specifically, "at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for

minimizing emissions." 40 C.F.R. § 60.11(d).

### 4. NSPS Subpart A: Requirements for Flares Used as Control Devices

61.     NSPS Subpart A contains specific regulations that apply to flares that are used as control devices for facilities subject to an NSPS. 40 C.F.R. §§ 60.18(b)-(f).

62.     Among other things, NSPS Subpart A requires that flares must be: a) designed and operated with no visible emissions (40 C.F.R. § 60.18(c)(1)), b) operated with a flame present at all times (40 C.F.R. § 60.18(c)(2)), c) monitored to ensure that they are operated and maintained in conformance with their design (40 C.F.R. § 60.18(d)), and d) operated at all times when emissions are vented to them (40 C.F.R. § 60.18(e)).

63.     Of relevance to this Complaint are the following requirements: for steam-assisted flares, the net heating value (NHV) of the gas being combusted in the flare must be 300 British Thermal Units (BTU) per standard cubic foot (scf) or greater (40 C.F.R. § 60.18(c)(3)(ii)); for steam-assisted flares, certain exit velocity requirements must be met, 40 C.F.R. § 60.18(c)(4); and for all flares, the owner or operator must monitor the flare to ensure that it is operated and maintained in conformance with its design, 40 C.F.R. § 60.18(d).

### 5. Specific NSPS Categorical Standards

64.     Pursuant to CAA Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), EPA has promulgated NSPS for the following categories of stationary sources, among others:

| SOURCE CATEGORY | NSPS REGULATION (40 C.F.R. Part 60) |
|---|---|
| Standards of Performance for Volatile Organic Liquid Storage Vessels (Including Petroleum Liquid Storage Vessels) for Which Construction, Reconstruction, or Modification Commenced After July 23, 1984 | Subpart Kb - 40 C.F.R. §§ 60.110b-60.117b |

| Standards of Performance for Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry (between Jan. 5, 1981 and Nov. 7, 2006). | Subpart VV - 40 C.F.R. §§ 60.480-60.489 |
|---|---|
| Standards of Performance for VOC Emissions from the Polymer Manufacturing Industry | Subpart DDD - 40 C.F.R. §§ 60.560-60.566 |
| Standards of Performance for VOC Emissions from Synthetic Organic Chemicals Manufacturing Industry Distillation Operations. | Subpart NNN - 40 C.F.R. §§ 60.660-60.668 |
| Standards of Performance for VOC Emissions from Synthetic Organic Manufacturing Industry (SOCMI) Reactor Processes. | Subpart RRR - 40 C.F.R. §§ 60.700-60.708 |

65.     Flares used as a control device for affected facilities subject to 40 C.F.R. Part 60, Subparts Kb, VV, DDD, NNN, or RRR must comply with the requirements of NSPS Subpart A, including 40 C.F.R. §§ 60.11(d) and 60.18.

66.     Part 60, Subparts Kb, VV, DDD, NNN, and RRR explicitly require that flares used as a control device for affected facilities subject to those subparts must comply with the requirements of 40 C.F.R. 60.18. *See* 40 C.F.R. § 60.112b(3)(i); 40 C.F.R. 60.482-10a(d); 40 C.F.R. §§ 60.562-1(a)(1)(i)(C) and (ii) and 60.562-2; 40 C.F.R. § 60.662(b), and 40 C.F.R. § 60.702(b).

67.     Part 60, Subparts VV and DDD explicitly require that flares used as a control devices for affected facilities subject to this subpart must be monitored to ensure that they are operated and maintained in conformance with their design. *See* 40 C.F.R. 60.482-10(e) and 40 C.F.R. § 60.563(c).

C. National Emissions Standards for HAPs

1. General: Section 112 prior to the 1990 CAA Amendments

68.     CAA Section 112 sets forth a national program for the control of hazardous air

pollutants (HAPs). *See* 42 U.S.C. § 7412 and 40 C.F.R. § 61.01(a). These requirements are known as "national emissions standards for hazardous air pollutants" (NESHAPs). NESHAPs established before the Clean Air Act was amended in 1990 are promulgated at 40 C.F.R. Part 61.

### 2. Part 61, Subpart A: NESHAP General Standards

69.     Pursuant to CAA Section 112, 42 U.S.C. § 7412, before it was amended on November 15, 1990 (the 1990 Amendments), EPA promulgated general regulations that apply to all stationary sources of HAPs that are subject to the NESHAPs, regardless of their source category. *See* 40 C.F.R. § 61.01(c). These general NESHAP standards are found at 40 C.F.R. Part 61, Subpart A, §§ 61.01-61.19 (NESHAP Subpart A).

70.     Like NSPS Subpart A, NESHAP Subpart A requires that "the owner and operator of each stationary source [of HAPs] shall maintain and operate the source, including associated equipment for air pollution control, in a manner consistent with good air pollution control practices for minimizing emissions." 40 C.F.R. § 61.12(c).

### 3. Specific Categorical NESHAPs

71.     Pursuant to CAA Section 112, as it existed before the 1990 Amendments, EPA promulgated NESHAPs for the following categories of stationary sources of HAPs:

| SOURCE CATEGORY | NESHAP (40 C.F.R. Part 61) |
|---|---|
| National Emission Standard for Benzene Waste Operations | Subpart FF - 40 C.F.R. §§ 61.340-61.358 |

72.     Flares used as a control device for sources subject to 40 C.F.R. Part 61, Subpart FF must comply with the requirements of 40 C.F.R. § 60.18. 40 C.F.R. § 61.349(a)(2)(iii) and (d).

73.     Flares used as a control device for sources subject to Part 61, Subpart FF must

comply with the requirement that each flare be maintained and operated "in a manner consistent with good air pollution control practice for minimizing emissions." 40 C.F.R. § 61.12(c).

4. General: Section 112 after the 1990 CAA Amendments

74.     In 1990, Congress amended the then-existing Section 112 and established a new program for the control of HAPs. *See* H.R. Rep. No. 101-490, 101st Cong., 2d Sess., part 1 at 324 (1990). The 1990 CAA Amendments did not alter the pre-1990 NESHAPs, and those regulations remain in effect unless specifically amended by a later regulation. *See* 40 C.F.R. § 63.1(a)(2).

75.     With the 1990 Amendments, Congress itself established a list of 188 HAPs believed to cause adverse health or environmental effects. *See* 42 U.S.C. § 7412(b)(1).

76.     Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs. 42 U.S.C. § 7412(c).

77.     *Major source* is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that, in the aggregate, emits or has the potential to emit, considering controls, in the aggregate, 10 TPY or more of any HAP or 25 TPY or more of any combination of HAPs. 42 U.S.C. § 7412(a)(1).

78.     *Stationary source* is defined in the same way as the term is defined under the NSPS. 42 U.S.C. §§ 7412(a)(3) and 7411(a)(3).

79.     A *category* of sources is a group of sources having some common features signifying that they should be regulated in the same way and on the same schedule. 57 Fed. Reg. 31,576-578 (July 16, 1992). A single stationary source can include multiple source categories. *Id.*

80.     Congress directed EPA to promulgate regulations establishing emission standards for each category of, *inter alia*, major sources of HAPs. 42 U.S.C. § 7412(d)(1). These emission

standards must require the maximum degree of reduction in emissions of HAPs that EPA, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies. *See* 42 U.S.C. § 7412(d)(2).

81.     To the extent that it is not feasible to prescribe or enforce an emission standard for the control of a HAP, Congress authorized EPA to promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards. 42 U.S.C. § 7412(h).

82.     The emission standards promulgated under CAA Section 112, 42 U.S.C. § 7412, as amended, are known as the NESHAPs for Source Categories. They are commonly referred to as maximum achievable control technology (MACT) standards. The MACT regulations are found at 40 C.F.R. Part 63.

83.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to CAA Section 112, as amended, no person may operate a source in violation of such standard, limitation, or regulation. 42 U.S.C. § 7412(i)(3).

5. Part 63, Subpart A: General Standards

84.     Pursuant to CAA Section 112, 42 U.S.C. § 7412, as amended, EPA promulgated regulations that apply to stationary sources of HAPs that are subject to the MACT standards, regardless of their source category. *See* 40 C.F.R. §§ 63.1(b) and (c). These general standards are found at 40 C.F.R. §§ 63.1-63.16 (MACT Subpart A).

85.     Under MACT Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) emits or has the potential to emit any HAP listed in

or pursuant to section 112(b) of the CAA; and (ii) is subject to any standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part." 40 C.F.R. § 63.1(b).

86.   Under MACT Subpart A, each relevant standard in Part 63 must identify explicitly whether each provision in MACT Subpart A is or is not applicable to sources subject to the specific relevant standard. *See* 40 C.F.R. § 63.1(a)(4)(i).

### a. MACT Subpart A: Good Air Pollution Control Practices

87.   Within MACT Subpart A, EPA promulgated a requirement that is similar to the "good air pollution control practices" requirement of NSPS Subpart A (*i.e.*, 40 C.F.R. § 60.11(d). Specifically, "[a]t all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions." 40 C.F.R. § 63.1(e)(1)(i).

### b. MACT Subpart A: Requirements for Flares Used as Control Devices

88.   Within MACT Subpart A, EPA promulgated specific regulations that apply to flares used as a control device for affected sources subject to a MACT standard. *See* 40 C.F.R. § 63.11(b).

89.   Of relevance to this Complaint are the following requirements:

   i. Flares must be monitored to ensure that they are operated and maintained in conformance with their design. *See* 40 C.F.R. § 63.11(b)(1).

   ii. Flares must be operated at all times when emissions are vented to them. *See* 40 C.F.R. § 63.11(b)(3).

   iii. Flares must be designed and operated with no visible emissions. *See* 40 C.F.R. § 63.11(b)(4).

   iv. Flares must be operated with a flame present at all times. *See* 40 C.F.R.

18

§ 63.11(b)(5).

v. Flares must be operated so that the gas being combusted in it has a net heating value of 300 BTU per scf or greater. *See* 40 C.F.R. § 63.11(b)(6)(ii).

vi. Flares must be operated in accordance with exit velocity requirements. *See* 40 C.F.R. § 63.11(b)(7) (for steam-assisted flares).

### c. Specific Categorical MACT Standards

90.     Pursuant to CAA Section 112(c), 42 U.S.C. § 7412(c), as amended, EPA

promulgated MACT regulations for the following categories of stationary sources of HAPs:

| SOURCE CATEGORY | MACT (40 C.F.R. Part 63) |
|---|---|
| National Emission Standard for Organic HAPs from the Synthetic Organic Chemical Manufacturing Industry | Subpart F - 40 C.F.R. §§ 63.100-63.107 |
| National Emission Standards for Organic HAPs from the Synthetic Organic Chemical Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater | Subpart G - 40 C.F.R. §§ 63.110-63.123 |
| National Emission Standards for Organic HAPs for Equipment Leaks | Subpart H - 40 C.F.R. §§ 63.160-63.183 |
| National Emission Standards for Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | Subpart SS - 40 C.F.R. §§ 63.980-63.999 |
| National Emission Standards for HAPs for Source Categories: Generic Maximum Achievable Control Technology Standards | Subpart YY - 40 C.F.R. §§ 63.1100-63.1114 |
| National Emission Standards for HAPs: Miscellaneous Organic Chemical Manufacturing | Subpart FFFF - 40 C.F.R. §§ 63.2430-63.2550 |

91.     Flares used as control devices for sources subject to 40 C.F.R. Part 63, Subparts

F, G, H, SS, YY, and FFFF must comply with the requirements of 40 C.F.R. § 63.11(b). *See* 40

C.F.R. Part 63, Subpart F, Table 3 (applicability for Subparts F, G, and H); 40 C.F.R.

§ 63.113(a)(1)(i) (Subpart G); 40 C.F.R. §§ 63.172(d) and (e) (Subpart H); 40 C.F.R.

§ 63.987(a) (Subpart SS); 40 C.F.R. § 63.1103(e), Table 7 (applicability for Subpart YY ethylene

production sources) (cross-referencing 40 C.F.R. §§ 63.982(b) and, in turn, 63.987(a)); and 40

C.F.R. Part 63, Subpart FFFF, Table 12.

92.     Under Part 63, Subpart YY owners and operators of an ethylene process vent

must reduce emissions of organic HAPs by 98 weight-percent, or reduce organic HAPs or total

organic compounds (TOC) to a concentration of 20 ppmv, whichever is less stringent, by venting

emissions through a closed vent system to any combination of control devices, including flares,

and meeting the requirements specified in 40 C.F.R. § 63.982(b) and (c)(2). 40 C.F.R.

§ 63.1103(e)(3) and Table 7 at (d).

93.      40 C.F.R. § 63.982(b) is found within Subpart SS of 40 C.F.R. Part 63. Subpart

SS provides National Emissions Standards for Closed Vent Systems, Control Devices, Recovery

Devices and Routing to a Fuel Gas System or Process. The provisions of Subpart SS apply only

when another Subpart (such as Subpart YY) references them. 40 C.F.R. § 63.980.

94.     Under 40 C.F.R. § 63.982(b), owners and operators that use a flare as a control

device on a closed vent system must meet the requirements of 40 C.F.R. § 63.987. Under 40

C.F.R. § 63.987, flares must meet the requirements of 40 C.F.R. § 63.11(b).

95.     Flares used as a control device for sources subject to Part 63, Subpart FFFF must

comply with the requirement in 40 C.F.R. § 63.6(e)(1)(i) that each flare be maintained and

operated "in a manner consistent with good air pollution control practice for minimizing

emissions." *See* 40 C.F.R. Part 63, Subpart FFFF, Table 12.

D. Title V Operating Permits

96.     Title V of the CAA, 42 U.S.C. § 7661-7661f, establishes a permit program for

certain stationary sources of air pollution, including major sources subject to CAA Section 111 (NSPS regulations), or Section 112 (NESHAP/MACT program) of the CAA, or any source required to have an NSR permit. *See* 42 U.S.C. § 7661a(a). The purpose of Tile V is to ensure that all "applicable requirements" governing a facility's compliance with the CAA, including SIP requirements, are consolidated and expressed in one document – an "operating" permit (*a/k/a* a "Title V permit"). *See* 42 U.S.C. § 7661c(a).

97.     Pursuant to CAA Section 502(b), 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992). These regulations are codified at 40 C.F.R. Part 70.

98.     Louisiana has an approved Title V program. *See* LAC 33:III.507 (approved at 60 Fed. Reg. 47,296-97 (Sept. 12, 1995)). LDEQ is therefore authorized to issue and enforce Title V permits in the state of Louisiana. The regulations governing Louisiana's Title V air operating permit program are set forth at LAC Title 33, Part III, Chapter 5 (Permit Procedures).

99.     Texas has an EPA approved Title V program. *See* 30 TAC, Chapter 122 (approved at 66 Fed. Reg. 63,318 (Dec. 6, 2001)). Texas is therefore authorized to issue and enforce Title V permits in the state of Texas. The regulations governing Texas' Title V air operating permit program are set forth at 30 TAC, Chapter 122 (Federal Operating Permits Program).

100.     In all respects relevant to this Complaint, the Title V regulations of Louisiana and Texas closely mirror the federal Title V regulations codified at 40 C.F.R. Part 70.

101.     CAA Section 504(a), 42 U.S.C. § 7661c(a), the implementing regulations at 40 C.F.R. § 70.6(a) and (c), and the Title V permit programs of Louisiana and Texas require that

21

each Title V permit include, among other things, enforceable emission limitations, compliance

schedules, and such other conditions as are necessary to assure compliance with "applicable

requirements" of the CAA and the requirements of the relevant SIP. *See* LAC 33:III.501.C and

507.A.3; 30 TAC § 122.142.

102.    *Applicable requirements* are defined to include any relevant NSPS,

NESHAP/MACT, and NSR requirements. *See* 40 C.F.R. § 70.2; *see also* LAC 33:III.502

(*defining* Federally Applicable Requirement); 30 TAC § 122.10(I).

103.    CAA Section 502(a), 42 U.S.C. § 7661a(a), and the Title V permit programs of

Louisiana and Texas prohibit violations of any requirement of a Title V permit. *See* LAC

33:501.C and 507.B; TAC § 122.143(4).

104.    CAA Section 502(a), 42 U.S.C. § 7661a(a), the implementing regulations at 40

C.F.R. §§ 70.1(b) and 70.7(b), and the Title V permit programs of Louisiana and Texas provide

that no source subject to Title V may operate except in compliance with a Title V permit. *See*

LAC 33:III.501.C and 507.B; 30 TAC § 122.121.

105.    Under Louisiana's operating permit program, no construction, modification, or

operation of a facility that ultimately may result in an initiation or increase in emissions may

begin until a Title V permit has been approved and issued by the LDEQ. LAC 33:III501.C,

507.B.2, and 517.A. Any permit issued must incorporate all federally applicable requirements.

*See* LAC 33:III.501.C, 507.A.3, and 507.B.2.

106.    CAA Section 503(c), 42 U.S.C. § 7661b(c), the implementing regulations at 40

C.F.R. § 70.5(a), and the Title V programs of Louisiana and Texas provide that each owner and

operator of a source subject to Title V permitting requirements must submit a permit application.

107.    CAA Section 503(b), 42 U.S.C. § 7661b(b), and 40 C.F.R. §§ 70.5(a)(2) and (c),

provide that any person required to have a Title V permit must submit, *inter alia*, as part of its permit application, a compliance plan to the permitting authority that describes how the source will comply or come into compliance with each applicable requirement of the CAA. *See also* LAC 33:III.501.C, 507.H, and 517.D and E; 30 TAC 122.130-122.134 and 122.142-122.148.

108.    Also, the Title V permit application must contain information sufficient to evaluate the relevant characteristics of the source and its permit application, and to determine all applicable requirements (including any requirement to meet the applicable control technology requirements under the PSD and Non-attainment NSR programs, and requirements to comply with the relevant NSPS and/or NESHAP/MACT standards). *See* 40 C.F.R. 70.5(a) and (c); LAC 33:III.501.C, 507.H, and 517.B, D, and E; 30 TAC §§ 122.132-122.134 and 122.142-122.148.

109.    The permit application must also contain a compliance plan for all applicable requirements for which the source is not in compliance and a certification of compliance with all applicable requirements. *See* U.S.C. § 7661b(b) and 40 C.F.R. § 70.5(a) and (c)(8)-(9).

110.    Under 40 C.F.R. § 70.5(b) and the Title V permit programs of Louisiana and Texas, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or correct information. *See* LAC 33:III.501.C and 517(C); 30 TAC 122.136.

111.    All terms and conditions of a Title V permit are enforceable by EPA. 42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

F. Enforcement of the Clean Air Act

112.    CAA Sections 113(a)(1) and (a)(3), 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b), if EPA finds that any person has violated or is

in violation of, *inter alia*, any requirement or prohibition of a SIP, the NSPS program, the NESHAP/MACT program, a PSD or Non-attainment NSR permit, the Title V permit program, or a Title V permit.

113.    CAA Section 113(b), 42 U.S.C. § 7413(b), authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction to address CAA violations, as well as to seek civil penalties of up to $25,000 per day for each violation of the CAA.

114.    The Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461 *et seq*., as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701, *et seq*., requires EPA to periodically adjust its civil penalties for inflation. For each violation that occurred between January 13, 2009 and November 2, 2015, inclusive, penalties of up to $37,500 per day may be assessed; and for each violation that occurred after November 2, 2015, penalties of up to $101,439 per day may be assessed for each violation. *Id.*; 40 C.F.R. § 19.4.

115.    La. R.S. 30:2025(E)(1)(a) authorizes civil penalties "of not more than the cost to the state of any response action made necessary by such violation which is not voluntarily paid by the violator, and a penalty of not more than [$32,500] for each day of violation. However, when any such violation is done intentionally, willfully, or knowingly, or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, such person may be liable for an additional penalty of not more than [$1,000,000]." Further, LDEQ is entitled to injunctive relief without the requisite showing of irreparable injury when the conduct sought to be restrained is unconstitutional or unlawful, *i.e.*, when the conduct sought to be enjoined constitutes a direct violation of a prohibitory law and/or a violation of a constitutional right. *Jurisich v. Jenkins*, 749 So. 2d 597 (La. 1999).

GENERAL ALLEGATIONS

116.    A flare is a combustion device that uses an uncontrolled volume of ambient air to burn and dispose of gases generated by industrial manufacturing processes. Flares are used at chemical manufacturing processes like the Defendants' Facilities, petroleum refineries, and other types of industrial facilities.

117.    Gas generated by facility operations that is directed to a flare for combustion is known as "vent gas."

118.    Flares are classified by their position (ground-level or elevated) and by the method used to enhance mixing at the flare tip, *e.g.*, steam-assisted, air-assisted, or non-assisted.

119.    *Steam-assisted* flares inject steam (assist-steam) that is piped to the flare tip to assist in combustion by promoting turbulence within a flare's flame.

120.    Flares constitute "air pollution control equipment" within the meaning of 40 C.F.R. § 60.11(d), 61.12(c), and 63.6(e)(1)(i).

121.    Flares constitute a "combustion device" and "control equipment" within the meaning of LAC Title 33, Part III, Chapter 1.

122.    Flares are designed, in part, to achieve high combustion efficiency of VOCs and HAPs. A flare's actual destruction efficiency depends on, *inter alia*, the heat value of the gas going to the flare, the heat value of the gas in the flare combustion zone, and the proportion of steam or air added to the flare tip. The heat value of the gas going to the flare indicates the combustibility of the gas, affecting flame stability, emissions, and flame structure. When the combustion zone gas has a higher heat value, it will generally be combusted more efficiently.

123.    The steam-to-vent gas ratio (generally referred to as S:VG) is one operational parameter used to monitor flare operation and combustion efficiency. The NHV of the gases in

25

the combustion zone of a flare (combustion zone gas) is another operational parameter that is an indicator of flare combustion efficiency.

124.    As part of its design, a steam-assisted flare must be operated within a range of steam-to-vent gas ratios that, at one end of the range, avoids smoking through an insufficient S:VG, and at the other end of the range, avoids incomplete combustion due to excessive steaming caused by an excessive S:VG ratio. Both insufficient and excessive S:VG ratios reduce VOC and HAP combustion efficiency below a flare's designed efficiency.

125.    Excessive levels of assist-steam will therefore reduce combustion efficiency and may effectively quench or snuff the flame.

126.    In order to monitor an "assisted" flare to ensure that it is operated and maintained in conformance with its design: i) the amount of vent gas and assist-steam flowing to the flare must be monitored, ii) the ratio of the flows of vent gas to assist-steam must be calculated, and iii) the flow of assist-steam must be sufficient and sufficiently controlled in order to maintain a design-appropriate S:VG ratio and a high VOC combustion efficiency.

127.    Good air pollution control practices to minimize emissions from flares include, *inter alia*, combusting essentially all molecules of hydrocarbons (which include VOCs) and HAPs in the vent gas sent to a flare. In order to allow for complete combustion of these substances, vent gas must have sufficient NHV and oxygen.

128.    For assisted flares, good air pollution control practices to minimize emissions from flares requires, *inter alia*, injecting assist-steam at a rate that maximizes flame stability and flare combustion efficiency.

129.    In order to inject assist-steam at a rate that maximizes flame stability and flare combustion efficiency: i) the amount of vent gas and assist-steam flowing to the flare must be

monitored; ii) the ratio of the flows of vent gas to assist-steam must be calculated, and iii) the flow of assist-steam must be subject to sufficient control to enable increasing or decreasing it in order to optimize the S:VG ratio, maintain a sufficient NHV of the combustion zone gas, and maintain a high VOC and HAP combustion efficiency.

130.    Defendants' Facilities manufacture olefins, including ethylene. Defendants' Facilities also produce other chemicals.

131.    At all times relevant to this Complaint, Defendant Dow has owned and operated six steam-assisted flares located at the Plaquemine Facility (LHC-2, LHC-3, LHC Tank Farm, Poly A, Poly B, and Poly C). These six flares are collectively referred to as the *Plaquemine Flares*.

132.    At all times relevant to this Complaint, Defendant Dow has owned and operated ten steam-assisted flares at the Freeport Facility (LHC-7 Large FS 1, LHC-8 Elevated FS-1, LHC-8 Ground GF-500, LHC-8 Small FS-1018, Marine Large FS-1, Marine Octene FS-100, PDC, Poly 3, Poly 4, and Poly Pilot Plant). These ten flares are collectively referred to as the *Freeport Flares*.

133.    At all times relevant to this Complaint, Defendant Union Carbide, either directly or as a wholly owned subsidiary of Defendant Dow, has owned or operated eight steam-assisted flares located at the Hahnville Facility (Acrylics, Butanol 1, Butanol 2, EO Site Logistics, Olefins 1, Olefins 2, Oxide Emergency, and SPU). These eight flares are collectively referred to as the *Hahnville Flares*.

134.    At all times relevant to this Complaint, Defendant PMNA, or a predecessor-in-interest has owned or operated two steam-assisted flares located at the Orange Facility (GDC and Ethylene). PMNA is, and has been since at least April 1, 2019, a wholly owned subsidiary of

Defendant Dow. These two flares are collectively referred to as the *Orange Flares*.

135.   At all times relevant to this Complaint, subject to a reasonable opportunity for further investigation and discovery, each of the Defendants' Facilities is a chemical process plant that has emitted or had the potential to emit at least 100 TPY of NOx and/or VOCs.

136.   At all times relevant to this Complaint, subject to a reasonable opportunity for further investigation and discovery, each of the Defendants' Facilities is a chemical process plant that has emitted or had the potential to emit at least 10 TPY or more of any individual HAP or 25 TPY or more of any combination of HAPs.

137.   At all times relevant to this Complaint, subject to a reasonable opportunity for further investigation and discovery, each of the Defendants' Facilities has met the definition of:

> a. *Major emitting facility*, as defined by CAA Section 169(1), 42 U.S.C. § 7479(1), and the implementing NSR regulations;
>
> b. *Major stationary source*, as defined by 40 C.F.R. § 52.21(b)(1)(i)(a);
>
> c. *Stationary source* as defined by 42 U.S.C. § 7411(a)(3) and the implementing NSPS regulations;
>
> d. *Major source* of HAPs, as defined by 42 U.S.C. § 7412(a)(1) and the implementing NESHAP and MACT regulations; and
>
> e. *Major source* as defined by 42 U.S.C. § 7661(a)(2) and the implementing Clean Air Act Title V regulations.

138.   At all times relevant to this Complaint, subject to a reasonable opportunity for further investigation and discovery, both the Hahnville and Plaquemine Facilities have met the definitions in the federally approved Louisiana SIP that adopt, incorporate, and/or implement the programs and regulations listed in ¶ 137.

139.   At all times relevant to this Complaint, subject to a reasonable opportunity for further investigation and discovery, the Freeport and Orange Facilities have met the definitions

in the federally approved Texas SIP that adopt, incorporate, and/or implement the programs and regulations listed in ¶ 137.

140.    At all times relevant to this Complaint, subject to a reasonable opportunity for further investigation and discovery, the Hahnville and Plaquemine Facilities have been subject to the Title V permitting requirements found in 40 C.F.R. Part 70 and the federally approved Louisiana SIP.

141.    At all times relevant to this Complaint, subject to a reasonable opportunity for further investigation and discovery, the Freeport and Orange Facilities have been subject to the Title V permitting requirements in 40 C.F.R. Part 70 and the federally approved Texas SIP.

142.    At all times relevant to this Complaint, one or more of the Hahnville Flares and/or Plaquemine Flares has been subject to the requirements of NSPS Subpart Kb, 40 C.F.R. § 60.112b.

143.    At all times relevant to this Complaint, Defendant Dow has used one or more of the Hahnville Flares and Plaquemine Flares as a control device to comply with the provisions of NSPS Subpart Kb, 40 C.F.R. § 60.112b.

144.    At all times relevant to this Complaint, one or more Hahnville Flares has been subject to the requirements of NSPS Subpart VV, 40 C.F.R. § 60.482-10.

145.    At all times relevant to this Complaint, Defendant Dow has used one or more closed vent systems and Hahnville Flares as a control device to comply with the provisions of NSPS Subpart VV, 40 C.F.R. § 60.482-10.

146.    At all times relevant to this Complaint, one or more of the Hahnville Flares and Plaquemine Flares has been subject to the requirements of NSPS Subpart DDD, 40 C.F.R. § 60.560-1(a)(1).

147.    At all times relevant to this Complaint, Defendants Dow and Union Carbide have used one or more of the Hahnville Flares and Plaquemine Flares as control devices to control continuous emission streams from affected facilities subject to NSPS Subpart DDD, 40 C.F.R. §§ 60.560-1(a)(1)(i)(C) and (ii) and 60.563(c).

148.    At all times relevant to this Complaint, one or more of the Hahnville Flares and Plaquemine Flares has been subject to the requirements of NSPS Subpart NNN, 40 C.F.R. § 60.662(b).

149.    At all times relevant to this Complaint, the Defendants have owned and operated distillation units, which are affected facilities within the meaning of NSPS Subpart NNN, that produce one or more of the chemicals listed in 40 C.F.R. § 60.667 at the Hahnville and Plaquemine Facilities, 40 C.F.R. § 60.660(a) and (b).

150.    At all times relevant to this Complaint, Defendants have used one or more of the Hahnville Flares and Plaquemine Flares to combust vent streams and emissions from affected facilities subject to NSPS Subpart NNN, 40 C.F.R. § 60.662(b).

151.    At all times relevant to this Complaint, one or more Hahnville Flares has been subject to the requirements of NSPS Subpart RRR, 40 C.F.R. § 60.702(b).

152.    At all times relevant to this Complaint, Defendant Union Carbide has owned and operated SOCMI process units at the Hahnville Facility, within the meaning of NSPS Subpart RRR, 40 C.F.R. § 60.702(b).

153.    At all times relevant to this Complaint, Defendant Dow has used one or more of Hahnville Flares to combust vent streams and emissions from affected facilities subject to NSPS Subpart RRR. 40 C.F.R. § 60.662(b).

154.    At all times relevant to this Complaint, one or more of the Orange Flares has been

30

subject to requirements of 40 C.F.R. Part 61, Subpart FF. 40 C.F.R. § 61.349(a)(2)(iii) and (d).

155.    At all times relevant to this Complaint, the Orange Facility has been a chemical manufacturing plant within the meaning of 40 C.F.R. Part 61, Subpart FF. 40 C.F.R. § 61.341. Chemical manufacturing plants as defined by 40 C.F.R. § 61.341, including the Orange Facility, are affected sources within the meaning of 40 C.F.R. Part 61, Subpart FF. 40 C.F.R. § 61.340(a).

156.    At all times relevant to this Complaint, Defendant PMNA owned and operated at the Orange Facility one or more process units that generate benzene-containing waste streams subject to the NESHAP for Benzene Operations. 40 C.F.R. § 61.342(c).

157.    At all times relevant to this Complaint, Defendant PMNA has used one or more of the Orange Flares as a control device for the benzene-containing waste streams and process units subject to the NESHAP for Benzene Waste Operations.

158.    40 C.F.R. Part 63, Subpart F, G and H set forth a group of related CAA requirements for stationary sources involved in synthetic organic chemical manufacturing (SOCMI Sources). This set of regulations is sometimes referred to as *hazardous organic NESHAP* (HON) standards.

159.    40 C.F.R. Part 63 Subpart F provides general applicability criteria for SOCMI Sources, including whether certain SOCMI Sources are, in turn, subject to 40 C.F.R. Part 63 Subpart G (for process vents, storage vessels, transfer operations, and wastewater at SOCMI Sources) and Subpart H (for equipment leaks from SOCMI Sources). 40 C.F.R. § 63.110(a).

160.    Owners and operators of SOCMI Sources that are subject to 40 C.F.R. Part 63, Subpart F are required to comply with applicable parts of 40 C.F.R. Part 63, Subpart G and H. 40 C.F.R. § 63.102(a).

161.    The affected sources under the HON standards also includes equipment required

by or used as a method of compliance with 40 C.F.R. Part 63, Subparts F, G or H, including

control devices such as flares. 40 C.F.R. § 63.100(e).

162.    At all times relevant to this Complaint, one or more of the Hahnville Flares,

Plaquemine Flares, and Freeport Flares has been subject to the requirements of 40 C.F.R. Part

63, Subparts F, G and/or H.

163.    At all times relevant to this Complaint, Defendants have owned and operated

"chemical manufacturing process units" within the meaning of 40 C.F.R. § 63.101(b) at the

Hahnville, Plaquemine, and Freeport Facilities.

164.    At all times relevant to this Complaint, Defendants have used one or more of the

Hahnville Flares, Plaquemine Flares, and Freeport Flares as a control device for sources, process

vents, and equipment subject to 40 C.F.R. Part 63, Subparts F, G and/or H.

165.    At all times relevant to this Complaint, one or more of the Plaquemine Flares and

Hahnville Flares has been subject to the requirements of 40 C.F.R. Part 63, Subpart YY.

166.    At all times relevant to this Complaint, Defendants have owned and operated

ethylene process vents from continuous ethylene production unit operations, within the meaning

of 40 C.F.R. § 63.1103(e)(2) at the Plaquemine and Hahnville Facilities. These process vents are

affected sources within the ethylene production category regulated by 40 CFR Part 63, Subpart

YY. 40 C.F.R. §§ 63.1100(a), Table 1 and 63.1103(e)(1)(i)(B).

167.    At all times relevant to this Complaint, Defendants have owned and operated

equipment that contains or contacts organic HAPs, within the meaning of 40 C.F.R.

§ 63.1101, and is subject to 40 C.F.R. Part 63, Subpart YY. This equipment includes pumps,

compressors, agitators, pressure relief devices, sampling collection systems, open-ended valves

or lines, valves, connectors, and/or instrumentation systems in organic HAP service, as defined

in 40 C.F.R. § 63.1103, for the ethylene production process unit(s) at the Plaquemine and Hahnville Facilities. This equipment is an affected source regulated by 40 C.F.R. Part 63, Subpart YY. 40 C.F.R. § 63.1103(e)(1)(i)(D).

168.    At all times relevant to this Complaint, Defendants have used one or more of the Plaquemine Flares and Hahnville Flares as a control device for process vents and equipment that is subject to 40 C.F.R. Part 63, Subpart YY. 40 C.F.R. § 63.1103(e), Table 7 (for process vents, cross-referencing to: 40 C.F.R. § 63.1034(b)(2)(iii) and, in turn, 40 C.F.R. § 63.987(a)).

169.    At all times relevant to this Complaint, each of the Defendants' Facilities have been subject to a federally enforceable Title V operating permit requiring, *inter alia*, that the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares comply with the requirements of  40 C.F.R. §§ 60.11(d) and/or 61.12(c).

170.    At all times relevant to this Complaint, each of the Defendants' Facilities have been subject to a federally enforceable Title V operating permit requiring, *inter alia*, that the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares comply with the requirements of one or more of the following: 40 C.F.R. § 60.18; 40 C.F.R. Part 63, Subparts A, G, SS, XX, YY, FFFF, and 40 C.F.R. § 63.11.

171.    At all times relevant to this Complaint, the Defendants' Plaquemine and Hahnville Facilities have each been subject to a federally enforceable Title V permit that has been issued pursuant to the Louisiana SIP.

172.    At all times relevant to this Complaint, the Defendants' Freeport and Orange Facilities have each been subject to a federally enforceable Title V permit that has been issued pursuant to the Texas SIP.

<u>FIRST CLAIM FOR RELIEF</u>

<u>Violation of New Source Review Requirements</u>

173.    Paragraphs 1 through 172 are re-alleged and incorporated by reference.

174.    Subject to a reasonable opportunity for investigation and discovery, at various times from 2009 to present, Defendants "commenced construction" of one or more "major modification[s]," as defined in the CAA, the Louisiana SIP, and the Texas SIP, at the Defendants' Facilities.

175.    Subject to a reasonable opportunity for investigation and discovery, Defendants made physical changes and/or changes in the methods of operation to one or more of the Flares identified in ¶¶s 131-134, and/or the closed vent systems (*a/k/a* flare headers) that transport gases from manufacturing process units to those Flares. Subject to a reasonable opportunity for investigation and discovery, these modifications include changes to the flare stacks, flare tips, main flare headers, and/or process unit sub-headers.

176.    Subject to a reasonable opportunity for investigation and discovery, one or more of these modifications resulted in a significant net emissions increase of VOCs, NOx, and/or CO from one or more of the Flares identified in ¶¶s 131-134.

177.    Defendants did not apply for, obtain, or operate pursuant to a PSD permit or a Non-attainment NSR permit, as applicable, for any of these modifications.

178.    Subject to a reasonable opportunity for investigation and discovery, Defendants failed to comply with various requirements of the PSD regulations for VOCs, NOx, and/or CO applicable to one or more of the Flares identified in ¶¶s 131-134, including, *inter alia*, failing to i) install and operate BACT on the flare system of one or more flares; ii) demonstrate that the emissions increases from the modifications would not cause or contribute to violations of air

quality standards; and iii) otherwise comply with the requirements of the PSD program, the Louisiana SIP, and the Texas SIP.

179.    Subject to a reasonable opportunity for investigation and discovery, Defendants failed to comply with the various requirements of the Non-attainment NSR regulations for VOCs applicable to one or more of the Flares identified in ¶ 132 at the Freeport, Texas Facility. Subject to a reasonable opportunity for investigation and discovery, Defendants have failed to, *inter alia*, i) install and operate LAER on the flare systems for the Freeport Flares; ii) secure emissions reductions (offsets) from existing sources in the same air quality region where the facility is located such that there would be a reasonable progress toward attainment of the applicable NAAQS; and iii) otherwise comply with the requirements of the Non-attainment NSR regulations and the corresponding implementing provisions of the Texas SIP.

180.    Subject to a reasonable opportunity for investigation and discovery, since the time the Defendants commenced construction of the major modifications alleged herein, Defendants have violated:

> (a) 42 U.S.C. § 7475;
>
> (b) 40 C.F.R. §§ 52.21(a)(2)(iii) and 52.21(j)-52.21(r)(5);
>
> (c) 40 C.F.R. Part 51, Appendix S, Part IV, Conditions (i)(a) 1-4; and
>
> (d) The federally enforceable Louisiana and Texas SIPs to the extent that each adopts, incorporates, and/or implements any of the federal provisions cited in sub-paragraphs 180(a)-(c).

181.    Unless restrained by an order of this Court, the violations alleged in this First Claim for Relief will continue.

182.    As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), the violations set forth above subject Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4.

Defendants Dow and Union Carbide are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for violations set forth above that occurred at the Defendants' Plaquemine and Hahnville Facilities.

SECOND CLAIM FOR RELIEF

Violation of Title V Requirements for New Source Review Violations

183.    Paragraphs 1 through 177 are re-alleged and incorporated by reference.

184.    Subject to a reasonable opportunity for investigation and discovery, as alleged in the First Claim for Relief, Defendants commenced construction of one or more major modifications at Defendants' Facilities. These activities triggered requirements, *inter alia*, to: i) obtain PSD and/or Non-attainment NSR permits establishing emissions limitations that meet BACT or LAER, as applicable, for one or more of the flares identified in ¶¶s 131-134, at Defendants' Facilities, ii) operate in compliance with BACT or LAER, as applicable, at one or more of these flares, and iii) other-wise comply with the requirements of the PSD or Non-attainment NSR programs, as applicable.

185.    Subject to a reasonable opportunity for investigation and discovery, Defendants failed to submit complete and timely applications for Title V operating permits for one or more of the flares identified in ¶¶s 131-134 at Defendants' Facilities that, *inter alia*, included enforceable BACT and LAER limits, identified all applicable requirements, accurately certified compliance with such requirements, and contained a compliance plan for all applicable requirements for which those Flares were not in compliance.

186.    In the alternative, Defendants failed to supplement or correct previously submitted incorrect or incomplete Title V permit applications in order to: i) seek enforceable BACT or LAER limits, as applicable, for one or more of the flares identified in ¶¶s 131-134, at

Defendants' Facilities, ii) identify all applicable requirements, iii) accurately certify compliance with such requirements, and iv) include a compliance plan for requirements for which these flares were not in compliance.

187.    Subject to a reasonable opportunity for investigation and discovery, Defendants have operated, and continue to operate, Defendants' Facilities without having valid Title V operating permits that require, *inter alia*, compliance with BACT or LAER, as applicable, for one or more of the flares identified in ¶¶s 131-134 at Defendants' Facilities, failed to identify all applicable requirements and/or failed to contain a compliance plan for coming into compliance BACT or LAER, as applicable, at these flares.

188.    Subject to a reasonable opportunity for investigation and discovery, Defendants' acts and/or omissions constitute violations of:

(a) 42 U.S.C. §§ 7661a(a)-(c);

(b) 40 C.F.R. §§ 70.1(b), 70.5(a)-(c), 70.6(a) and (c), and 70.7(b); and

(c) The federally enforceable corollary provisions of the Louisiana and Texas Title V programs that adopt, incorporate, and/or implement any of the federal provisions cited in sub-paragraphs 188(a) and (b).

189.    Unless restrained by an order of this Court, the violations alleged in this Second Claim for Relief will continue.

190.    As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), the violations set forth above subject Defendants to injunctive relief and civil penalties. See also 40 C.F.R. § 19.4. Defendants Dow and Union Carbide are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Plaquemine and Hahnville Facilities.

## THIRD CLAIM FOR RELIEF

Violations of NSPS, NESHAP, and MACT Requirements;
Title V Permits that Incorporate these Requirements

(Failure to Monitor to Ensure Flares are
Operated and Maintained in Conformance with their Design)

191.    Paragraphs 1 through 172 are re-alleged and incorporated by reference.

192.    Since at least 2009, the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares have been subject to one or more of the following CAA regulations: 40 C.F.R. Part 60, Subparts Kb, VV, DDD, NNN, and/or RRR; 40 C.F.R. Part 61, Subpart FF; and/or 40 C.F.R. Part 63, Subparts F, G, H, SS, XX, YY, and/or FFFF.

193.    Since at least 2009, the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares have been subject to a federally enforceable Title V permit that compels compliance with one or more of the following CAA regulations: 40 C.F.R. Part 60, Subparts Kb, VV, DDD, NNN, and/or RRR; 40 C.F.R. Part 61, Subpart FF; and/or 40 C.F.R. Part 63, Subparts F, G, H, SS, XX, YY, and/or FFFF.

194.    Since at least 2009, the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares have been subject to the requirements of 40 C.F.R. §§ 60.18(d) and/or 63.11(b)(1).

195.    At various times since the first calendar quarter of 2009, Defendants have failed to perform the following at one or more of the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares: i) install and/or properly operate vent gas flow monitors and assist-steam flow monitors; ii) calculate steam-to-vent gas ratios; or iii) have sufficient controls on steam flow to maintain steam-to-vent gas within design parameters.

196.    The acts and omissions identified in this Claim for Relief constitute violations of:

a. CAA Sections 111 and 112, 42 U.S.C. §§ 7411, 7412;

b. 40 C.F.R. §§ 60.18(d), 63.11(b)(1);

c. The provisions of 40 C.F.R. Part 60, Subparts Kb, VV, DDD, NNN and/or RRR; 40 C.F.R. Part 61, Subpart FF; and/or 40 C.F.R. Part 63, Subparts F, G, H, SS, XX, YY, and/or FFFF that require flares to comply with the requirements identified in sub-paragraphs 196(a) and (b);

d. The federally enforceable corollary provisions of the Louisiana SIP and Texas SIP that adopt, incorporate, and/or implement the federal provisions cited in sub-paragraphs 196(a)-(c);

e. The terms of the CAA Title V permits for the Defendants' Facilities that require compliance with the requirements identified in sub-paragraphs 196(a)-(d); and

f. The prohibition against violating a CAA Title V permit found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

197.   Unless restrained by an order of this Court, the violations alleged in this Third Claim for Relief will continue.

198.   As provided in CAA Section 113(b), 42 U.S.C. §§ 7411(b), the violations set forth above subject Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4. Defendants Dow and Union Carbide are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Plaquemine and Hahnville Facilities.

<u>FOURTH CLAIM FOR RELIEF</u>

Violations of NSPS, NESHAP, and MACT Requirements;
<u>Title V Permits that Incorporate these Requirements</u>

(Failure to Operate Flares Consistent with Good Air Pollution Control Practices)

199.   Paragraphs 1 through 172 are re-alleged and incorporated by reference.

200.   Since at least 2009, the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares have been subject to the requirements of 40 C.F.R. §§ 60.11(d), 61.12(c), and/or

63.6(e)(1)(i).

201.   At various times since at least the first calendar quarter of 2009, Defendants operated one or more of the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares without sufficient NHV in the combustion zone gas.

202.   Operating the flares at an insufficient NHV reduced combustion efficiency and resulted in excessive emissions to the atmosphere from the flares of un-combusted and partially-combusted HAPs and hydrocarbons (including VOCs), CO, and other pollutants.

203.   At various times since at least the first quarter of 2009, Defendants operated one or more of the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares with excessively high S:VG ratios.

204.   Operating the flares with excessively high S:VG ratios increased the likelihood of flame quenching or snuffing, reduced flare combustion efficiency, and resulted in excessive emissions from the flares to the atmosphere of un-combusted and partially-combusted HAPs and hydrocarbons (including VOCs), and other pollutants.

205.   Since at least the first calendar quarter of 2009, Defendants failed to install, or failed to use, sufficient equipment and/or monitoring systems at one or more of the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares to enable Defendants to monitor, measure, and/or calculate the NHV in the combustion zone gas of the flares. Moreover, Defendants failed to add supplemental gas quickly enough or in sufficient amounts to maintain sufficient NHV in the combustion zone gas.

206.   Since at least the first calendar quarter of 2009, at one or more of the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares, Defendants failed to: i) install or use adequate monitoring to measure the flow of vent gas and/or assist-steam to the flares, ii)

calculate and monitor the ratio of the flows of vent gas to assist-steam, and/or iii) install

sufficient controls on, or sufficiently control the flow of, assist-steam to enable increasing or

decreasing it in order to optimize the S:VG, maintain a sufficient NHV of the combustion zone

gas, maximize flame stability, and maintain a high VOC combustion efficiency.

207.     Defendants violated good air pollution control practices by, *inter alia*: i) operating

the flares with an insufficient NHV in the combustion zone gas, ii) failing to monitor the NHV in

the combustion zone gas of the Flares, iii) operating the flares with excessively high S:VG ratios,

iv) failing to install monitors sufficient to measure and calculate S:VG ratios at the flares, and/or

v) operating the flares without sufficient controls to optimize the assist-steam injection rate.

208.     The Defendants acts and omissions constitute violations of:

a. CAA Sections 111(e) and 112, 42 U.S.C. §§ 7411(e), 7412;

b. 40 C.F.R. §§ 60.11(d), 61.12(c), and 63.6(e)(1)(i);

c. The provisions of 40 C.F.R. Part 60, Subparts Kb, VV, DDD, NNN, and/or RRR; 40 C.F.R. Part 61, Subpart FF; and/or 40 CFR Part 63, Subparts F, G, H, SS, XX, YY, and/or FFFF that require flares to comply with the requirements identified in sub-paragraphs 208(a) and (b);

d. The federally enforceable corollary provisions of the Louisiana SIP and Texas SIP that adopt, incorporate, and/or implement the federal provisions cited in sub-paragraphs 208 (a)-(c);

e. The terms of the CAA Title V permits for the Defendants' Facilities that require compliance with the requirements identified in sub-paragraphs 208 (a)-(d); and

f. The prohibition against violating a CAA Title V permit found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

209.     Unless restrained by an order of this Court, the violations alleged in this Fourth

Claim for Relief will continue.

210.     As provided in CAA Section 113(b), 42 U.S.C. §§ 7411(b), the violations set

forth above subject Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4. Defendants Dow and Union Carbide are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Plaquemine and Hahnville Facilities.

## FIFTH CLAIM FOR RELIEF

### Violations of NSPS, NESHAP, and MACT Requirements; Title V Permits that Incorporate these Requirements

### (Combusting Gas in Flares with a NHV of Less than 300 BTU/scf)

211.     Paragraphs 1 through 172 are re-alleged and incorporated by reference.

212.     Since at least 2009, the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares have been subject to the requirements of 40 C.F.R. § 60.18(c)(3) and/or 63.11(b)(6).

213.     At various times since the first calendar quarter of 2009, Defendants combusted gas that had a NHV less than 300 BTU/scf in one of more of the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares.

214.     The acts and omissions identified in this Fifth Claim constitute violations of:

a. CAA Sections 111(e) and 112, 42 U.S.C. §§ 7411(e), 7412;

b. 40 C.F.R. §§ 60.11(c)(3)(ii) and 63.11(b)(6)(ii);

c. The provisions of 40 C.F.R. Part 60, Subparts Ka, VV, DDD, NNN and/or RRR; 40 C.F.R. Part 61, Subpart FF; and/or 40 CFR Part 63, Subparts F, G, H, SS, XX, YY, and/or FFFF that require flares to comply with the requirements identified in sub-paragraphs 214(a) and (b);

d. The federally enforceable corollary provisions of the Louisiana SIP and Texas SIP that adopt, incorporate, and/or implement the federal provisions cited in sub-paragraphs 214 (a)-(c);

e. The terms of the CAA Title V permits for the Defendants' Facilities that require compliance with the requirements identified in sub-paragraphs

214 (a)-(d); and

f. The prohibition against violating a CAA Title V permit found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

215.     Unless restrained by an order of this Court, the violations alleged in this Fifth Claim for Relief will continue.

216.     As provided in CAA Section 113(b), 42 U.S.C. §§ 7411(b), the violations set forth above subject Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4. Defendants Dow and Union Carbide are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Plaquemine and Hahnville Facilities.

## SIXTH CLAIM FOR RELIEF

Violations of NSPS, NESHAP, and MACT Requirements;
Title V Permits that Incorporate these Requirements

(Failure to Comply with Additional Flare Operation Requirements)

217.     Paragraphs 1 through 172 are re-alleged and incorporated by reference

218.     Since at least 2009, the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares have been subject to the requirements of 40 C.F.R. § 60.18(b) and/or 63.11(b).

219.     At various times since at least 2009, Defendants failed to operate one or more of the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares at all times when emissions were vented to the flare(s), and/or operated one or more of the Hahnville Flares, Plaquemine Flares, Orange Flares, and Freeport Flares: i) with visible emissions, ii) at times when no flame was present, or iii) without complying with the maximum exit velocity requirements.

220.     The acts and omissions identified in this Sixth Claim constitute violations of:

43

a. CAA Sections 111(e) and 112, 42 U.S.C. §§ 7411(e), 7412;

b. 40 C.F.R. §§ 60.18(c)(1) and 63.11(b)(4);

c. 40 C.F.R. §§ 60.18(c)(2) and 63.11(b)(5);

d. 40 C.F.R. §§ 60.18(c)(4) and 63.11(b)(7);

e. 40 C.F.R. §§ 60.18(e) and 63.11(b)(3);

f. The provisions of 40 C.F.R. Part 60, Subparts Ka, VV, DDD, NNN, and/or RRR; 40 C.F.R. Part 61, Subpart FF; and/or 40 CFR Part 63, Subparts F, G, H, SS, XX, YY, and/or FFFF that require flares to comply with the requirements identified in sub-paragraphs 220(a) and (e);

g. The federally enforceable corollary provisions of the Louisiana SIP and Texas SIP that adopt, incorporate, and/or implement the federal provisions cited in sub-paragraphs 220(a)-(f);

h. The terms of the CAA Title V permits for the Defendants' Facilities that require compliance with the requirements identified in sub-paragraphs 220(a)-(g); and

f. The prohibition against violating a CAA Title V permit found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

221.     Unless restrained by an order of this Court, the violations alleged in this Sixth Claim for Relief will continue.

222.     As provided in CAA Section 113(b), 42 U.S.C. §§ 7411(b), the violations set forth above subject Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4. Defendants Dow and Union Carbide are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Plaquemine and Hahnville Facilities.

## IX. PRAYER FOR RELIEF

WHEREFORE, the United States and LDEQ respectfully request that this Court:

1. Enter judgment in favor of the United States and the LDEQ and against Defendants,

The Dow Chemical Co., Union Carbide Corp., and Performance Materials, NA, Inc.;

2. Order Defendants to take all actions necessary to operate the flares at Defendants' Facilities in compliance with the Clean Air Act requirements that this Complaint alleges the Defendants violated, including the applicable requirements of the Louisiana and Texas SIPs;

3. Permanently enjoin Defendants from operating the flares at Defendants' Facilities except in accordance with the Clean Air Act and applicable regulatory requirements, including the Louisiana and Texas SIPs;

4. Order Defendants to take other appropriate actions to remedy, mitigate, and offset the harm caused by the alleged Clean Air Act violations, by among other things, requiring Defendants to address or offset their unlawful emissions;

5. Assess civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015; and up to $101,439 per day for each violation occurring after November 2, 2015;

6. Assess civil penalties, pursuant to La. R.S. 30:2025(E)(1)(a), of up to the cost to the LDEQ of any response action made necessary by the violations alleged in the Complaint not voluntarily paid by Defendants Dow and Union Carbide, and a penalty of up to $32,500 for each day of violation; and, if any violation alleged in the Complaint has been done intentionally, willfully, or knowingly, or has resulted in a discharge or disposal which caused or causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, assess an additional penalty of up to $1,000,000;

7. Award Plaintiffs their costs of this action; and

8. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Jonathan D. Brightbill
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


/s/ Kirk W. Koester
Kirk W. Koester
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
202.514.9009 (office)
202.532.3272 (mobile)
kirk.koester@usdoj.gov

Peter G. Strasser
United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, Louisiana  70130


OF COUNSEL:

Robert Parrish, Attorney-Advisor
Air Enforcement Division, Office of Civil Enforcement
United States Environmental Protection Agency, HQ
Room 2109B
Mail Code 2242A
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460




ATTORNEYS FOR THE UNITED STATES

FOR THE LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY


DWANA KING (La. Bar # 20590)
Deputy General Counsel
OSCAR MAGEE (La. Bar# 32302)
Trial Attorney
Office of the Secretary, Legal Affairs Division
Louisiana Department of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana  70821-4302
Phone: 225.219.3985
Fax: 225.219.4068
dwana.king@la.gov
oscar.magee@la.gov


ATTORNEYS FOR THE LOUISIANA
DEPARTMENT OF ENVIRONMENTAL
QUALITY