**EXHIBIT A**

**PART 1 OF 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,<br><br>                    Plaintiffs,<br><br>            v.<br><br>THE DOW CHEMICAL COMPANY, PERFORMANCE MATERIALS NA, INC., and the UNION CARBIDE CORPORATION<br><br>                  Defendants. | CIVIL ACTION NO. 2:21-cv-114<br><br>Section<br><br>Mag. |

CONSENT DECREE

TABLE OF CONTENTS

TABLES OF APPENDICES ................................................................................................. iii

I.      JURISDICTION AND VENUE .................................................................... - 4 -

II.     APPLICABILITY ......................................................................................... - 5 -

III.    DEFINITIONS ............................................................................................. - 8 -

IV.     CIVIL PENALTY ........................................................................................ - 19 -

V.      COMPLIANCE REQUIREMENTS ............................................................. - 20 -

A.      Instrumentation and Monitoring Systems .................................................. - 20 -

B.      Determining Whether a Covered Flare that has a Water Seal is Not Receiving Potentially
        Recoverable Gas Flow ............................................................................... - 28 -

C.      Waste Gas Minimization ............................................................................ - 28 -

D.      Flare Gas Recovery Systems for Covered Facilities with Compressors........... - 35 -

E.      Flare Combustion Efficiency ..................................................................... - 41 -

F.      Fenceline Monitoring Requirements .......................................................... - 48 -

VI.     LOUISIANA BENEFICIAL ENVIRONMENTAL PROJECTS................... - 49 -

VII.    PERMITS..................................................................................................... - 51 -

VIII.   EMISSION CREDIT GENERATION .......................................................... - 53 -

IX.     REPORTING REQUIREMENTS ................................................................ - 54 -

X.      STIPULATED PENALTIES ........................................................................ - 58 -

XI.     FORCE MAJEURE ..................................................................................... - 65 -

XII.    DISPUTE RESOLUTION ........................................................................... - 68 -

XIII.   INFORMATION COLLECTION AND RETENTION ................................. - 71 -

XIV.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .................................... - 72 -

XV.    COSTS ..................................................................................................................... - 77 -

XVI.   26 U.S.C. § 162(f)(2)(A)(ii) IDENTIFICATION ........................................... - 78 -

XVII.  NOTICES ................................................................................................................. - 78 -

XVIII. EFFECTIVE DATE ................................................................................................. - 80 -

XIX.   RETENTION OF JURISDICTION ...................................................................... - 80 -

XX.    MODIFICATION ................................................................................................... - 81 -

XXI.   TERMINATION .................................................................................................... - 81 -

XXII.  PUBLIC PARTICIPATION ................................................................................... - 83 -

XXIII. SIGNATORIES/SERVICE .................................................................................... - 83 -

XXIV. INTEGRATION ..................................................................................................... - 84 -

XXV.  FINAL JUDGMENT .............................................................................................. - 84 -

XXVI. APPENDICES ........................................................................................................ - 84 -

## TABLES OF APPENDICES

Table 1:

| NUMBER | ABBREVIATION | DESCRIPTION |
|--------|--------------|-------------|
| 1.1 | | RESERVED |
| 1.2 | $NHV_{cz}$, $NHV_{dil}$, and $V_{tip}$ | Calculating $NHV_{cz}$, $NHV_{dil}$, and $V_{tip}$ for Flares |
| 1.3 | Tip-Area-Eq | Calculating the Unobstructed Cross Sectional Area of Various Types of Flare Tips |
| 1.4 | G-Drwg | Depiction of Gases Associated with Steam-Assisted Flares |
| 1.5 | Flr-Data-Rpt | Outline of Requirements for the Flare Data and Initial Monitoring Systems Report |
| 1.6 | Interim Provisions | Interim Compliance Provisions and Schedule for Instrumentation Upgrades at the Freeport FS-1, Freeport GF-500, Hahnville EO Site Logistics, Orange CDG, Plaquemine LHC-2, Plaquemine Poly A, and Plaquemine Poly C Flares |
| 1.7 | WG-Map | Waste Gas Mapping: Level of Detail Needed to Show Main Headers and Process Unit Headers |
| 1.8 | Hahnville $C_2H_2$ | Acetylene Streams at the Hahnville Olefins 1 and 2 FGRS |
| 1.9 | Hanville $H_2/CH_4$ Route-Around | Hahnville Olefins 2 Hydrogen/Methane Vent Gas Stream Route-Around of FGRS Olefins 2 FGRS |
| 1.10 | Orange $H_2$ Route-Around | Orange Ethylene Plant Hydrogen Rich Gas Mixture Route-Around of the Ethylene FGRS |

Table 2:

| NUMBER | ABBREVIATION | DESCRIPTION |
|--------|--------------|-------------|
| 2.1 | BEP | Louisiana Beneficial Environmental Project Protocol |
| 2.2 | Fenceline Monitoring | Fenceline Monitoring Requirements |

Concurrently with the lodging of this Consent Decree, Plaintiffs, the United States of America (United States), on behalf of the United States Environmental Protection Agency (EPA) and the Louisiana Department of Environmental Quality (LDEQ), have filed a complaint in this action seeking injunctive relief and civil penalties from the Defendants, The Dow Chemical Company, Performance Materials NA, Inc., and the Union Carbide Corporation. (Defendants *or* Applicable Defendant(s)), for alleged violations of the Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq.*, with respect to emissions of volatile organic compounds (VOCs), hazardous air pollutants (HAPs), and other pollutants at the chemical manufacturing facilities located in or near Freeport, Texas (Freeport Facility), Hahnville, Louisiana (Hahnville Facility), Plaquemine, Louisiana (Plaquemine Facility), and Orange, Texas (Orange Facility);

Co-plaintiff LDEQ also seeks injunctive relief and civil penalties from the Applicable Defendants at the Hahnville and Plaquemine Facilities for alleged violations of the Louisiana Environmental Quality Act (LEQA), La.R.S. 30:2001 *et seq.*;

The Dow Chemical Company owns and operates the Freeport and Plaquemine Facilities, including the Steam-Assisted Flares used at those facilities as safety devices and to control emissions of air pollutants generated by the manufacturing processes;

The Union Carbide Corporation owns and operates the Hahnville Facility, including the Steam-Assisted Flares used at that facility as safety devices and to control emissions of air pollutants generated by the manufacturing processes;

The Union Carbide Corporation is a wholly owned subsidiary of The Dow Chemical Company;

Performance Materials NA, Inc. owns and operates the Orange Facility, including the Steam-Assisted Flares used at that facility as safety devices and to control emissions of air pollutants generated by the manufacturing processes;

Performance Materials NA, Inc. became a wholly owned subsidiary of The Dow Chemical Company on April 1, 2019;

The Complaint alleges that the Defendants violated one or more of the following CAA or Louisiana or Texas state air pollution requirements:

a.    The Prevention of Significant Deterioration (PSD) requirements found in 42 U.S.C. § 7475 and 40 C.F.R. §§ 52.21(a)(2)(iii) and 52.21(j)-52.21(r)(5);

b.    The Non-Attainment New Source Review (NNSR) requirements found in 42 U.S.C. §§ 7502(c)(5), 7503(a)-(c) and 40 C.F.R. Part 51, Appendix S, Part IV, Conditions 1-4;

c.    The New Source Performance Standards (NSPS) promulgated at 40 C.F.R. Part 60, Subparts A, Kb, DDD and NNN pursuant to Section 111 of the CAA, 42 U.S.C. § 7411;

d.    The National Emission Standards for Hazardous Air Pollutants (NESHAPs) promulgated at: 40 C.F.R. Part 61, Subparts A and FF; and 40 C.F.R. Part 63, Subparts A, F, G, H, Y, SS, XX, YY, and FFFF pursuant to Section 112 of the CAA, 42 U.S.C. § 7412;

e.    The Title V requirements of the CAA found at 42 U.S.C. §§ 7661a(a), 7661b(c), 7661c(a); and 40 C.F.R. §§ 70.1(b), 70.5(a) and (b), 70.6(a) and (c), and 70.7(b);

f.    The portions of the Title V permits for the Freeport, Hahnville, Orange, and Plaquemine Facilities that adopt, incorporate, or implement the provisions cited in c-d and g; and

g.    The federally enforceable Louisiana and Texas state implementation plan (SIP) provisions that incorporate, adopt, and/or implement the federal requirements listed in c-e.

By entering into this Consent Decree, the Defendants commit to undertake projects at the Covered Facilities intended to reduce emissions of air pollutants from the Covered Facilities;

As more specifically described in Section V (Compliance Requirements), the Defendants have agreed to operate monitoring equipment and control technology, as well as undertake additional measures, at the Covered Facilities that will recover and minimize Waste Gas flows to the twenty-six Flares covered by this Consent Decree (Covered Flares) and ensure proper Combustion Efficiency at the Covered Flares;

Implementing the Consent Decree's compliance requirements is estimated to cost approximately $294 million;

Between January 1, 2015 and full implementation of the Consent Decree's compliance requirements, EPA estimates that emissions from the Covered Flares will be reduced by approximately the following amounts (in tons per year or TPY):

| Pollutant | Amount in TPY (2015 – through implementation) |
|---|---|
| VOCs | 5,689 |
| Carbon Dioxide Equivalents ($CO_2e$) | 517,423 |
| HAPs | 480 |
| Nitrogen Oxides (NOx) | 127 |

Implementing the Consent Decree's compliance requirements will also reduce carbon monoxide (CO) from the Covered Flares;

LDEQ estimates that the Louisiana beneficial environmental projects (BEPs) required to be implemented pursuant to Section VI of this Consent Decree will cost $424,786;

The United States and LDEQ anticipate that the specific and comprehensive compliance measures set forth in this Consent Decree, which are subject to a reasonable timetable for implementation, will result in the cessation of the violations alleged in the Complaint and those resolved through Section XIV (Effect of Settlement);

The Defendants deny any past and continuing violations of the statutory and regulatory requirements set forth in the preceding clauses and deny any liability to the United States and LDEQ arising out of the occurrences alleged in the Complaint; and

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b). This Court has personal jurisdiction over The Dow Chemical Company and the Union Carbide Corporation because they are located and do business within the jurisdictional boundaries for the United States District Court for the Eastern District of Louisiana, as established under 28 U.S.C. § 98. This Court has supplemental jurisdiction over the state law claims asserted by LDEQ pursuant to 28 U.S.C. § 1367. Venue is proper in this District pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b)

and (c) and 1395(a), because it is the judicial district in which The Dow Chemical Company and the Union Carbide Corporation are located, are doing business, and in which a substantial part of the alleged violations occurred. For purposes of this Consent Decree, Defendants, including Performance Materials NA, Inc., consent to: i) this Court's jurisdiction over them; and ii) venue in this judicial district.

2.      For purposes of this Consent Decree, Defendants agree that the Complaint states claims upon which relief may be granted.

3.      Notice of the commencement of this action has been given to LDEQ and the Texas Commission on Environmental Quality (TCEQ) in accordance with Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b).

## II. APPLICABILITY

4.      The obligations of this Consent Decree are binding upon the United States and LDEQ, and apply to and are binding upon Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

5.      At least sixty Days before a transfer of the ownership or operation of any of the Covered Facilities or Covered Flares, the Applicable Defendant(s) must provide a copy of this Consent Decree to the proposed transferee. At least thirty Days before any such transfer, the Applicable Defendant(s) must provide written notice of the prospective transfer to EPA and the United States, in accordance with Section XVII (Notices). For transfers of the Hahnville or Plaquemine Facilities or of the Covered Flares located at those two facilities, at least thirty Days before such transfer, the Applicable Defendant(s) must also provide written notice of the prospective transfer to LDEQ in accordance with Section XVII (Notices). Any attempt to

transfer ownership or operation of any of the Covered Facilities or Covered Flares without complying with this Paragraph constitutes a violation of this Decree.

6.      If the Applicable Defendant(s) intend(s) to request that the United States or LDEQ agree to a transferee's assumption of any obligations of the Consent Decree, the Applicable Defendant(s) must condition the transfer of the Covered Facility or Covered Flare upon the transferee's written agreement to execute a modification to the Consent Decree that makes the terms and conditions of the Consent Decree applicable to, binding upon, and enforceable against the transferee.

7.      As soon as possible before the transfer, the Applicable Defendant(s) must: (i) notify the United States and, if applicable, LDEQ of the proposed transfer and of the specific Consent Decree provisions that the Applicable Defendant(s) propose(s) the transferee assume; (ii) certify that the transferee is contractually bound to assume the ongoing compliance requirements and obligations of this Consent Decree; and (iii) require the transferee to submit to the United States and, if applicable, LDEQ both a certification that the transferee has the financial and technical ability to assume the ongoing compliance requirements and obligations of this Consent Decree and a certification that the transferee is contractually bound to assume the ongoing compliance requirements and obligations of this Consent Decree.

8.      After submitting to the United States and, if applicable, LDEQ the notice and certification required by the previous Paragraph, either: (i) the United States, after consultation with LDEQ, if applicable, will notify the Applicable Defendant(s) that the United States does not agree to modify the Consent Decree to make the transferee responsible for complying with the terms and conditions of the Consent Decree; or (ii) the United States, the Applicable Defendant(s), the transferee, and, if applicable, LDEQ must file with the Court a joint motion

- 6 -

requesting the Court approve a modification substituting the transferee for the Applicable

Defendant(s) as the defendant responsible for complying with the terms and conditions of the

Consent Decree that the Applicable Defendant(s) intend(s) the transferee to assume.

9.      If the Applicable Defendant(s) does(do) not secure the agreement of the United

States to a joint motion to modify the Consent Decree within a reasonable period of time, then

the Applicable Defendant(s) and the transferee may file, without the agreement of the United

States, a motion requesting the Court to approve a modification substituting the transferee for

the Applicable Defendant(s) as the defendant(s) responsible for complying with the terms and

conditions of the Consent Decree that the transferee intends to assume. The United States and, if

applicable, LDEQ may file an opposition to the motion. The motion to modify will be granted

unless the Applicable Defendant(s) and the transferee: (i) fail to show that the transferee has the

financial and technical ability to assume the ongoing compliance requirements and obligations

of the Consent Decree; (ii) fail to show that the modification language effectively transfers the

ongoing compliance requirements and obligations to the transferee; or (iii) the Court finds other

good cause for denying the motion.

10.     The Applicable Defendant(s) must provide a copy of this Consent Decree to all

officers whose duties might reasonably include compliance with any provision of this Decree.

For all employees whose duties might reasonably include compliance with any provision of this

Decree, as well as for any contractor retained to perform work required under this Consent

Decree, the Applicable Defendant(s) must provide a copy of the portions of this Consent Decree

that are applicable to the employee's duties or to the contractor's work. These copies may be

provided by hard copy, electronic copy or by providing online access with a notice to the

affected people. The Applicable Defendant(s) must condition any such contract upon

performance of the work in conformity with the applicable terms of this Consent Decree. Copies of the applicable provisions of the Consent Decree do not need to be supplied to contractors or vendors that are retained to supply materials or equipment to satisfy the requirements of this Consent Decree.

11.    In any action to enforce this Consent Decree, the Applicable Defendant(s) will not raise as a defense the failure by any of its(their) officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III. DEFINITIONS

12.    Terms used in this Consent Decree that are defined in the Clean Air Act or in federal or state regulations promulgated pursuant to the CAA will have the meanings assigned to them in the CAA or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

  a.    *Applicable Defendant(s)* means: (i) with respect to all four Covered Facilities, The Dow Chemical, Company; (ii) with respect to the Hahnville Facility, The Dow Chemical Company and the Union Carbide Corporation; and (iii) with respect to the Orange Facility, The Dow Chemical Company and Performance Materials NA, Inc.

  b.    *Assist Air* means all air that is intentionally introduced before or at a Flare tip through nozzles or other hardware conveyance for the purposes of, including, but not limited to, protecting the design of the Flare tip, promoting turbulence for mixing, or inducing air into the flame. Assist Air includes premix Assist Air and Perimeter Assist Air. Assist Air does not include surrounding ambient air.

  c.    *Assist Steam* means all steam that is intentionally introduced before or at a Flare tip through nozzles or other hardware conveyance for the purposes of, including, but not limited to, protecting the design of the Flare tip, promoting turbulence for mixing, or inducing air into the flame. Assist Steam includes, but is not necessarily limited to, Center Steam, lower steam, and upper steam. Assist Steam does not include water vapor that exists in the header prior to the flare and is accounted for in the measurement of the Net Heating Value of the Vent Gas.

d.   *Available for Operation* means, with respect to a Compressor within a FGRS, that the Compressor is capable of commencing the recovery of Potentially Recoverable Gas as soon as practicable but not more than one hour after the Need for a Compressor to Operate arises. The period of time, not to exceed one hour, allowed by this definition for the startup of a Compressor will be included in the amount of time that a Compressor is Available for Operation. The periods provided for in sub-Paragraphs 38.f (Maintenance of FGRS) and 38.g (FGRS Shut Down) may be included in the amount of time that the Compressors are Available for Operation.

e.   *Baseload Waste Gas Flow Rate* means, for a Covered Flare, the daily average flow rate, in scfd, to that Flare, excluding all flows during periods of startup, shutdown, and Malfunction. The flow rate data period that must be used to determine Baseload Waste Gas Flow Rate is set forth in sub-Paragraph 29.a(2).

f.   *BTU/scf* means British Thermal Unit per standard cubic foot.

g.   *Calendar Quarter* means a three-month period ending on March 31, June 30, September 30, or December 31.

h.   *Capable of Receiving Sweep, Supplemental, and/or Waste Gas* means, for a Flare, that the flow of Sweep Gas, Supplemental Gas, and/or Waste Gas is not prevented from being directed to the Flare by means of an isolation device such as closed valves, blinds, and/or stopples.

i.   *Center Steam* means the portion of Assist Steam introduced into the stack of a Flare to reduce burnback.

j.   *Combustion Efficiency* or *CE* means a Flare's efficiency in converting the organic carbon compounds found in Combustion Zone Gas to carbon dioxide. Combustion Efficiency must be determined in accordance with Appendix 1.2.

k.   *Combustion Zone* means the area of the Flare flame where the Combustion Zone Gas combines for combustion.

l.   *Combustion Zone Gas* means all gases and vapors found after the Flare tip. This gas includes all Vent Gas, Pilot Gas, Total Steam, and Assist Air. Assist air does not include the surrounding ambient air.

m.   *Complaint* means the complaint filed by the United States and LDEQ in this action.

- 9 -

n.  *Compressor* means, with respect to a FGRS, a mechanical device designed and installed to recover gas from a flare header. Types of FGRS compressors include reciprocating compressors, centrifugal compressors, liquid ring compressors, screw compressors, and liquid jet ejectors.

o.  *Consent Decree* or *Decree* means this Consent Decree, including any and all tables and attached appendices.

p.  *Covered Facility* or *Covered Facilities* means the Freeport, Hahnville, Orange, and Plaquemine Facilities.

q.  *Covered Flare* or *Covered Flares* means each of the following Flares, as well as any Newly Installed Covered Flare or Portable Flare in use at a Covered Facility:

- the Freeport Flares,
- the Hahnville Flares,
- the Orange Flares, and
- the Plaquemine Flares.

r.  *Date of Lodging* means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Eastern District of Louisiana.

s.  *Day* means a calendar day unless expressly stated to be a business day. In computing any period of time for a compliance deadline under this Consent Decree (*e.g.*, a deadline for installing a FGRS or submitting a WGMP), where the last day would fall on a Saturday, Sunday, or federal or Louisiana state holiday, the period will run until the close of business of the next business day.

t.  *Defendants* means The Dow Chemical Company, the Union Carbide Corporation, and Performance Materials NA, Inc.

u.  *Design Capacity* means, with respect to a FGRS, the sum of the capacities, in mscf per Day, of the installed flare gas recovery Compressors.

v.  *Effective Date* has the meaning ascribed to it in Section XVIII.

w.  *EPA* means the United States Environmental Protection Agency and any of its successor departments or agencies.

x.  *External Utility Loss* means a loss in the supply of electrical power or other third-party utility to a Covered Facility that is caused by actions

occurring outside the boundaries of a Covered Facility, excluding utility losses due to an interruptible utility service agreement.

y.     *Flare* means a combustion device lacking an enclosed combustion chamber that uses an uncontrolled volume of ambient air to burn gases.

z.     *Flare Gas Recovery System* or *FGRS* means a system of one or more Compressors, piping, and associated water seal, rupture disk, or other equipment used to divert gas from a Flare and direct the gas to a fuel gas system, to a combustion device other than the Flare, or to a product, co-product, by-product, or raw material recovery system.

aa.    *Flare Tip Velocity* or *Vtip* means the velocity of gases exiting the Flare tip as defined in Paragraph 40.

bb.    *Freeport Facility* means the petrochemical manufacturing facility owned and operated by The Dow Chemical Company, located at 2301 Brazosport Boulevard, Freeport, Texas.

cc.    *Freeport Flares* means the following 10 Steam-Assisted Flares located at the Freeport Facility:

- LHC-7 Large FS-1
- LHC-8 Elevated FS-1
- LHC-8 Ground GF-500
- LHC-8 Small FS-1018
- Marine Large FS-1
- Marine Octene FS-100
- PDC
- Poly 3
- Poly 4
- Poly Pilot Plant

dd.    *Hahnville Facility* means the petrochemical manufacturing facility owned and operated by the Union Carbide Corporation, located at Louisiana Highway 3142 Hahnville, Louisiana.

ee.    *Hahnville Flares* means the following 8 Steam-Assisted Flares located at the Hahnville Facility:

- Acrylics
- Butanol 1

- 11 -

- Butanol 2
- EO Site Logistics
- Olefins 1
- Olefins 2
- Oxide Emergency
- SPU

ff.    *In Operation*, with respect to a Flare, means all times that Sweep, Supplemental, or Waste Gas is or may be vented to a Flare. A Flare that is In Operation is Capable of Receiving Sweep, Supplemental, or Waste Gas unless all Sweep, Supplemental, and Waste Gas flow is prevented by means of an isolation device such as closed valves, blinds, and/or stopples.

gg.    *KSCFH* or *kscfh* means thousand standard cubic feet per hour.

hh.    *LDEQ* means the Louisiana Department of Environmental Quality and any of its successor departments or agencies.

ii.    *Lower Heating Value* or *LHV* means the theoretical total quantity of heat liberated by the complete combustion of a unit volume or weight of a fuel initially at 25 degrees Centigrade and 760 mmHg, assuming that the produced water is vaporized and all combustion products remain at, or are returned to, 25 degrees Centigrade; however, the standard for determining the volume corresponding to one mole is 20 degrees Centigrade.

jj.    *Malfunction* means, as specified in 40 C.F.R. § 60.2, any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not Malfunctions. In any dispute under this Consent Decree involving this definition, the Applicable Defendant(s) has(have) the burden of proving:

(1)    The excess emissions were caused by a sudden, unavoidable breakdown of technology, beyond the control of the owner or operator;

(2)    The excess emissions: (a) did not stem from any activity or event that could have been foreseen and avoided, or planned for, and (b) could not have been avoided by better operation and maintenance practices;

(3)    To the maximum extent practicable the air pollution control equipment or processes were maintained and operated in a

- 12 -

manner consistent with good practice for minimizing emissions;

(4)     Repairs were made in an expeditious fashion when the operator knew or should have known that applicable emission limitations were being exceeded. Off-shift labor and overtime must have been used, to the extent practicable, to ensure that such repairs were made as expeditiously as practicable;

(5)     The amount and duration of the excess emissions (including any bypass) were minimized to the maximum extent practicable during periods of such emissions;

(6)     All possible steps were taken to minimize the impact of the excess emissions on ambient air quality;

(7)     All emission monitoring systems were kept in operation if at all possible;

(8)     The owner or operator's actions during the period of excess emissions were documented by properly signed, contemporaneous operating logs, or other relevant evidence;

(9)     The excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance; and

(10)    The owner or operator properly and promptly notified the appropriate regulatory authority if required.

kk.     *Monitoring System Malfunction* means any sudden, infrequent, and not reasonably preventable failure of instrumentation or a monitoring system to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not Monitoring System Malfunctions. In any dispute under this Consent Decree involving this definition, the Applicable Defendant(s) has(have) the burden of proving:

(1)     The instrument or monitoring system downtime was caused by a sudden, unavoidable breakdown of technology, beyond the control of the owner or operator;

(2)     The instrument or monitoring system downtime: (a) did not stem from any activity or event that could have been

- 13 -

foreseen and avoided, or planned for, and (b) could not have been avoided by better operation and maintenance practices;

(3)     To the maximum extent practicable, the instrument or monitoring system was maintained and operated in a manner consistent with good practice for minimizing emissions;

(4)     Repairs were made in an expeditious fashion when the operator knew or should have known that applicable emission limitations were being exceeded. Off-shift labor and overtime must have been used, to the extent practicable, to ensure that such repairs were made as expeditiously as practicable;

(5)     The amount and duration of the instrument or monitoring system downtime was minimized to the maximum extent practicable;

(6)     The owner or operator's actions during the period of instrument or monitoring system downtime were documented by properly signed, contemporaneous operating logs, or other relevant evidence; and

(7)     The instrument or monitoring system downtime was not part of a recurring pattern indicative of inadequate design, operation, or maintenance.

ll.     *MSCF* or *mscf* means million standard cubic feet.

mm.     *Need for a Compressor to Operate* means:

(1)     <u>For a situation in which no Compressor within the FGRS is recovering gas</u>: When a Potentially Recoverable Gas flow rate (determined on a fifteen-minute block average) to the Covered Flare(s) serviced by the FGRS exists; or

(2)     <u>For a situation in which one or more Compressors within the FGRS already are recovering gas</u>: When the Potentially Recoverable Gas flow rate (determined on a fifteen-minute block average) exceeds the capacity of the operating Compressor(s).

nn.     *Net Heating Value* means Lower Heating Value.

- 14 -

oo.   *Net Heating Value Analyzer* or *NHV Analyzer* means an instrument capable of measuring the Net Heating Value of Vent Gas in BTU/scf. The sample extraction point of a Net Heating Value Analyzer may be located upstream of the introduction of Supplemental Gas and/or Sweep Gas and/or Purge Gas if the composition and flow rate of any such Supplemental Gas and/or Sweep Gas and/or Purge Gas is known and if this known value then is used in the calculation of the Net Heating Value of the Vent Gas.

pp.   *Net Heating Value of Combustion Zone Gas* or $NHV_{cz}$ means the Lower Heating Value, in BTU/scf, of the Combustion Zone Gas in a Flare. $NHV_{cz}$ must be calculated in accordance with Step 3 of Appendix 1.2.

qq.   *Net Heating Value of Vent Gas* or $NHV_{vg}$ means the Lower Heating Value, in BTU/scf, of the Vent Gas directed to a Flare. $NHV_{vg}$ must be calculated in accordance with Step 1 of Appendix 1.2.

rr.   *New Source Review* or *NSR* means the PSD and NNSR provisions in Part C and D of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, 7501-7515, the Minor NSR provisions in § 7410(a), applicable federal regulations implementing such provisions of the CAA, and the corresponding provisions of the federally enforceable SIPs for the state of Louisiana and the state of Texas.

ss.   *Newly Installed Covered Flare(s)* means any Flare that is permanently installed, receives Waste Gas that has been redirected to it from an existing Covered Flare (existing as of the Effective Date), and commences operation at a Covered Facility after the Effective Date.

tt.   *Orange Facility* means the petrochemical manufacturing facility owned and operated by Performance Materials NA, Inc., located at 2739 Farm-to-Market Road 1006, Orange, Texas.

uu.   *Orange Flares* means the following 2 Steam-Assisted Flares located at the Orange Facility:

- CDG; and
- Ethylene

vv.   *Paragraph* means a portion of this Decree identified by an Arabic numeral.

ww.   *Parties* means the United States, LDEQ, and the Defendants.

xx.   *Pilot Gas* means gas introduced into a Flare tip that provides a flame to ignite the Vent Gas.

yy.   *Plaquemine Facility* means the petrochemical manufacturing facility owned and operated by The Dow Chemical Company, located at 21255 Louisiana Highway 1, Plaquemine, Louisiana.

zz.   *Plaquemine Flares* means the following six Steam-Assisted Flares located at the Plaquemine Facility:

- LHC-2
- LHC-3
- LHC Tank Farm
- Poly A
- Poly B
- Poly C

aaa.   *Portable Flare* means a Flare that is not permanently installed and that receives Waste Gas that has been redirected to it from a Covered Flare during an outage.

bbb.   *Potentially Recoverable Gas* means the Sweep Gas, Supplemental Gas, and/or Waste Gas (including hydrogen, nitrogen, oxygen, carbon dioxide, carbon monoxide, and/or water) directed to a Covered Flare's or group of Covered Flares' FGRS, except that Regeneration Waste Gas Streams are not included in the definition of Potentially Recoverable Gas.

ccc.   *Prevention Measure* means an instrument, device, piece of equipment, system, process change, physical change to process equipment, procedure, or program to minimize or eliminate flaring.

ddd.   *Purge Gas* means the gas introduced between a Flare header's water seal and the Flare tip to prevent oxygen infiltration (backflow) into the Flare tip. For a Flare with no water seal, the function of Purge Gas is performed by Sweep Gas, and therefore, by definition, such a Flare has no Purge Gas.

eee.   *Regeneration Waste Gas Streams* means Waste Gas streams produced during the regeneration of the dryers, reactors, and other vessels at the Covered Facilities. Regeneration Waste Gas Streams are high in nitrogen (typically approximately 90%) and have very low heating value (typically approximately 100 btu/scf), thus they are not a useful fuel.

fff.   *Reportable Flaring Incident* means when Waste Gas equal to or greater than 500,000 scf is flared within a 24-hour period at any Covered Facility

- 16 -

from its Covered Flare(s). For purposes of calculating whether the triggering level of Waste Gas flow has been met, the following flows may be excluded: i) the pro-rated Baseload Waste Gas Flow Rate (pro-rated on the basis of the duration of the Reportable Flaring Incident); and ii) if a Covered Facility has instrumentation capable of measuring the concentrations of hydrogen, nitrogen, oxygen, carbon monoxide, carbon dioxide, and/or water (steam) in the Waste Gas, the contribution of the calculated flow of the above compounds for which a concentration is measured may be excluded. A flaring event or events that have the same root cause(s) and that last(s) more than 24 hours will be considered a single Reportable Flaring Incident. When flaring occurs at more than one Covered Flare, the volume of non-excluded Waste Gas flow at each Covered Flare must be added together unless the root cause(s) of the flaring at each Covered Flare is(are) not related to each other.

ggg.    *SCFD* or *scfd* means standard cubic feet per Day.

hhh.    *SCFH* or *scfh* means standard cubic feet per hour.

iii.    *SCFM* or *scfm* means standard cubic feet per minute.

jjj.    *Section* means a portion of this Decree identified by a roman numeral.

kkk.    *Smoke Emissions* has the meaning set forth in Section 3.5 of Method 22 of 40 C.F.R. Part 60, Appendix A. For purposes of this Decree, Smoke Emissions may be either documented by a video camera or determined by an observer knowledgeable with respect to the general procedures for determining the presence of Smoke Emissions per Method 22.

lll.    *Standard Conditions* means a temperature of 68 degrees Fahrenheit and a pressure of 1 atmosphere. Unless otherwise expressly set forth in this Consent Decree or an Appendix, Standard Conditions apply.

mmm.    *Steam-Assisted Flare* means a Flare that uses Assist Steam piped to a Flare tip to assist in combustion.

nnn.    *Supplemental Gas* means all gas introduced to a Flare in order to improve the combustible characteristics of the Combustion Zone Gas.

ooo.    *Sweep Gas* means gas intentionally introduced into a Flare header system to prevent oxygen buildup in the Flare header.

ppp.    *Total Steam* means the total of all Assist Steam that is supplied to a Flare and includes, but is not limited to, lower steam, Center Steam, and upper steam.

qqq. *United States* means the United States of America, acting on behalf of EPA.

rrr. *Unobstructed Cross Sectional Area of the Flare Tip* or $A_{tip\text{-}unob}$ means the open, unobstructed area of a Flare tip through which Vent Gas and Center Steam pass. Diagrams of four common Flare types are set forth in Appendix 1.3 together with the equations for calculating the $A_{tip\text{-}unob}$ of these four types.

sss. *Vent Gas* means all gas found just before the Flare tip. This gas includes all Waste Gas, that portion of Sweep Gas that is not recovered, Purge Gas, and Supplemental Gas, but does not include Pilot Gas, Total Steam, or Assist Air.

ttt. *Visible Emissions* means five minutes or more of Smoke Emissions during any two consecutive hours.

uuu. *VOC* or *Volatile Organic Compounds* has the meaning ascribed to it in 40 C.F.R. § 51.100(s).

vvv. *Waste Gas* means the mixture of all gases from facility operations that is directed to a Flare for the purpose of disposing of the gas. Waste Gas does not include gas introduced to a Flare exclusively to make it operate safely and as intended; therefore, Waste Gas does not include Pilot Gas, Total Steam, Assist Air, or the minimum amount of Sweep Gas and Purge Gas that is necessary to perform the functions of Sweep Gas and Purge Gas. Waste Gas also does not include the minimum amount of gas introduced to a Flare to comply with regulatory or enforceable permit requirements regarding the combustible characteristics of Combustion Zone Gas; therefore, Waste Gas does not include Supplemental Gas. Depending upon the instrumentation that monitors Waste Gas, certain compounds (hydrogen, nitrogen, oxygen, carbon dioxide, carbon monoxide, and/or water (steam)) that are directed to a Flare for the purpose of disposing of these compounds may be excluded from calculations relating to Waste Gas flow. The circumstances in which such exclusions are permitted are specifically identified in Section V (Compliance Requirements). Appendix 1.4 to this Consent Decree depicts the meaning of Waste Gas, together with its relation to other gases associated with Flares.

## IV. CIVIL PENALTY

13.    Within thirty Days after the Effective Date of this Consent Decree, Defendants

must pay the following amounts as a civil penalty:

    a.    $2,325,000 to the United States, and

    b.    $675,000 to LDEQ.

14.    Defendants must pay the civil penalty due to the United States by FedWire

Electronic Funds Transfer (EFT) to the United States Department of Justice in accordance with

written instructions to be provided to Defendants, following entry of the Consent Decree, by the

Financial Litigation Unit (FLU) of the United States Attorney's Office for the Eastern District

of Louisiana. The payment instructions provided by the FLU will include a Consolidated Debt

Collection System (CDCS) number, which Defendants must use to identify all payments

required to be made in accordance with this Consent Decree. The FLU will provide the payment

instructions to:

    Ms. Karen Williams
    The Dow Chemical Company
    P.O. Box 150 (E-105)
    Plaquemine, LA  70764
    (225) 353-1675
    KBWilliams@dow.com

    Ms. Fran Falcon
    The Dow Chemical Company
    332 SH 332 E (APB-1B022)
    Lake Jackson, TX 77566
    (979) 238-9764
    FQFalcon@dow.com

Defendants may change the individual to receive payment instructions on its behalf by providing

written notice of such change to the United States and EPA in accordance with Section XVII

(Notices).

15.     At the time of payment, Defendants must send a copy of the EFT authorization form and the EFT transaction record, together with a cover letter, stating that the payment is for the civil penalty owed in accordance with the Consent Decree in *United States, et al. v. The Dow Chemical Company, et al.,* **[insert civil action number],** and DOJ No. 90-5-2-1-11114, to the United States pursuant to Section XVII (Notices) of this Consent Decree; and by first class mail to: United States Attorney's Office, Eastern District of Louisiana, 650 Poydras Street, Suite 1600, New Orleans, Louisiana 70130, and to EPA at cinwd_acctsreceivable@epa.gov and first class mail at: EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268.

16.     The Defendants must not deduct any penalties paid under this Consent Decree in accordance with this Section or Section X (Stipulated Penalties) in calculating their federal, state, or local income tax.

17.     The Defendants must pay the civil penalty due to LDEQ by bank check made payable to the Louisiana Department of Environmental Quality and sent to: Accountant Administrator, Financial Services Division, LDEQ, P.O. Box 4303, Baton Rouge, Louisiana 70821-4303 or by EFT in accordance with written instructions provided to Defendants upon request. Any bank check must reference this Consent Decree and the civil action number.

## V.   COMPLIANCE REQUIREMENTS

### A.   Instrumentation and Monitoring Systems

18.     Flare Data and Monitoring Systems and Protocol Report. For each Covered Flare, by no later than 365 Days after the Effective Date, the Applicable Defendant(s) must submit a report, conforming to the requirements in Appendix 1.5, to EPA that includes the following:

      a.      The information, diagrams, and drawings specified in Paragraphs 1-7 of Appendix 1.5;

      b.      A detailed description of each instrument and piece of monitoring equipment, including the specific model and manufacturer, that the Applicable Defendant(s) has(have) installed or will install in compliance with Paragraphs 20-24 of this Consent Decree (Paragraphs 8-9 of Appendix 1.5); and

      c.      A narrative description of the monitoring methods and calculations that the Applicable Defendant(s) will use to comply with the requirements of Paragraph 43 (Paragraph 10 of Appendix 1.5).

19.    <u>Installation and Operation of Monitoring and Control Systems on Covered Flares</u>.

      a.      By no later than the Effective Date, the Applicable Defendant(s) must install and commence operation of the instrumentation, controls, and monitoring systems set forth in Paragraphs 20-23 at each Covered Flare (except for: Newly Installed Covered Flares; Portable Flares; and particular monitoring systems at the Hahnville EO Site Logistics, Orange CDG, Plaquemine LHC-2, Plaquemine Poly A, and Plaquemine Poly C Flares that must comply with this Paragraph or with the portions of Paragraphs 20, 21, and 23 and additional procedures specified in Appendix 1.6).

      b.      By no later than the date that any Newly Installed Covered Flare or Portable Flare is In Operation and Capable of Receiving Waste, Supplemental, and/or Sweep Gas at a Covered Facility, the Applicable Defendant(s) must complete installation and commence operation of the instrumentation, controls, and monitoring systems set forth in Paragraphs 20-23. The Applicable Defendant(s) must operate the instrumentation, controls, and monitoring systems for each Newly Installed Covered Flare and Portable Flare in accordance with Paragraphs 20-23.

20.   <u>Vent Gas and Assist Steam Monitoring Systems</u>.

a.     For each Covered Flare (except for the Hahnville EO Site Logistics, Orange CDG, Plaquemine Poly A, and Plaquemine Poly C Flares, which must comply with this Paragraph pursuant to the terms and schedule set forth in Appendix 1.6), the Applicable Defendant(s) must install, operate, calibrate, and maintain a monitoring system capable of continuously measuring, calculating, and recording the volumetric flow rate of Vent Gas in the header or headers feeding that Covered Flare. This system must also be able to continuously analyze pressure and temperature at each point of Vent Gas flow measurement. Different flow monitoring methods may be used to measure different gaseous streams that make up the Vent Gas provided that the flow rates of all gas streams that contribute to the Vent Gas are determined. Flow must be calculated in scfm.

b.     For each Covered Flare, the Applicable Defendant(s) must install, operate, calibrate, and maintain a monitoring system capable of continuously measuring, calculating, and recording the volumetric flow rate of Assist Steam used with each Covered Flare. This system must also be able to continuously analyze the pressure and temperature of Assist Steam at a representative point of steam flow measurement. Flow must be calculated in scfm.

c.     Each flow rate monitoring system must be able to correct for the temperature and pressure of the system and output parameters in Standard Conditions.

d.     In lieu of a monitoring system that directly measures volumetric flow rate, the Applicable Defendant(s) may choose from the following additional options for monitoring any gas stream:

(1)     Mass flow monitors may be used for determining the volumetric flow rate of Assist Steam provided that the Applicable Defendant(s) convert(s) the mass flow rates to

- 22 -